FILED

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DEC - 1 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| ZURICH CAPITAL MARKETS INC., ZCM ASSET HOLDING COMPANY (BERMUDA) LIMITED, ZCM ASSET HOLDING COMPANY LLC, ZCM MATCHED FUNDING CORP., <br><br> Plaintiffs, <br><br> -vs- <br><br> MICHAEL COGLIANESE, MICHAEL COGLIANESE, C.P.A., P.C., CCS FINANCIAL SERVICES, INC. f/k/a COMMODITY COMPLIANCE SERVICES, INC., COMMODITY COMPLIANCE SERVICES INTERNATIONAL, LTD., GLC SERVICES, CORP., GINA COGLIANESE, JEFFREY A. VORISEK, VORISEK & COMPANY LLC, OCEANIC BANK AND TRUST COMPANY LIMITED, TERAH RAHMING, KENNETH CLOWES, SONIC INVESTMENTS LTD., RELMS LIMITED, DAVID LUNN, MILLENNIUM FUND I, LTD., DELTA LIMITED, MARCUS J. MAHY, LANDMARK TRUST (BERMUDA) LIMITED, GLOBAL ARBITRAGE DEVELOPMENT LIMITED, JOHN CASELEY, AMBASSADOR DIRECTORS LIMITED, IAN LEDGER, LANDMARK MANAGEMENT, S.A.M. a/k/a LANDMARK MONACO, <br><br> Defendants. | CASE NO. 03 C 7960 <br><br> Hon. John W. Darrah <br><br> Magistrate Judge <br> Michael T. Mason <br><br> DOCKETED <br> DEC 0 1 2003 |

## AMENDED COMPLAINT

Plaintiffs ZCM Matched Funding Corp. ("ZCM MFC"), ZCM Asset Holding Company

LLC ("ZCM Asset"), ZCM Asset Holding Company (Bermuda) Limited ("ZCM Bermuda"), and

Zurich Capital Markets Inc. ("ZCM Inc.") (collectively, "Plaintiffs" or "ZCM"), with knowledge

of their own acts and acts taking place in their presence, and upon information and belief as to all

other matters, by their undersigned counsel, Boies, Schiller & Flexner LLP and Jenner & Block, LLC, for their Amended Complaint allege as follows:

## I. SUMMARY OF THE ACTION

1.     This action arises from a fraudulent investment scheme orchestrated by Michael Coglianese, an Illinois certified public accountant, and several individuals, investment funds, and fund administrators, many of which were formerly affiliated with the New World Group, a conglomerate of fund administrators with offices in the Bahamas and Monaco, and others affiliated with Southridge Capital Management Inc. ("Southridge"), an investment advisor in Connecticut.

2.     Michael Coglianese is the creator, promoter, control person, investment advisor, selling agent and/or accountant for hundreds of on-shore and off-shore investment companies. (Chart 1.)

3.     Coglianese obtained this status by: (1) agreeing to help investment managers form hedge funds, mutual funds or commodity pools in exchange for being retained as the accountant for those funds, (2) entering into referral arrangements with various fund administrators whereby he would agree to recommend them as fund administrators if they would agree to retain him (or his affiliated entities) as accountants for their funds, (3) entering into agency/investor advisor agreements with numerous investments funds whereby he would agree to perform due diligence on their behalf and refer them to new investment opportunities, (4) entering into referral fee or management fee sharing arrangements with investment funds whereby he would agree to cause his existing clients to invest in their funds in exchange for being retained as an accountant for the target fund and/or in exchange for a percentage of the management fees generated by his clients'

2

investment in the fund, and (5) entering into mutual referral agreements with various hedge fund auditors. (Chart 1.)

4.      The power obtained by Coglianese through these various arrangements enabled him to: (1) issue inaccurate financial statements, account statements, statements of Net Asset Value, performance reports, and other offering materials for the fund, (2) engage in, and conceal, transactions that benefit his own clients to the detriment of all other shareholders in a fund, and (3) multiply the management, incentive, and administration fees charged to shareholders by causing their investment in a fund to be funneled through numerous other funds for the benefit of his business associates and affiliated entities.

5.      In this instance, in addition to the above harms, he was able to defraud Plaintiffs and numerous other investors into investing millions of dollars into highly risky and illiquid funds, including three funds affiliated with Southridge – Dominion Capital Fund Limited ("Dominion"), Sovereign Partners, L.P. ("Sovereign"), and V.C. Advantage (Bermuda) Fund, Ltd. ("V.C. Advantage") – while the investors thought they were investing in an extremely safe and liquid Bahamian mutual fund that engaged in a "market neutral" trading strategy, namely M.J. Select Global Fund, Ltd. ("M.J. Select"). (Chart 2.)

6.      Coglianese was able to accomplish this because M.J. Select's administrator, Oceanic Bank and Trust Company ("Oceanic"), and its predecessors-in-interest, New World Trustees (Bahamas) Limited ("New World") and Rawson Trust Company ("Rawson"), entrusted all of their responsibilities to Coglianese, permitted him to run the fund without any meaningful compliance checks or supervision, and appointed their own employees as puppet directors, in exchange for excessive, unearned fees and continued business referrals from Coglianese. Coglianese and Oceanic and its employees also permitted Coglianese and his friends and

3

associates to convert Plaintiffs' interests in M.J. Select and two affiliated funds that were also

invested in M.J. Select, namely M.J. Diversified Fund, L.P. ("MJD") and M.J. Financial

Arbitrage, L.P. ("MJFA").

7.    As a result of the defendants' unlawful conduct, ZCM has suffered damages in

excess of $24.2 million.

8.    M.J. Select is now in liquidation in the Bahamas.  However, the Joint Official

Liquidators of M.J. Select have not pursued claims against the fund's administrator or directors, or

many of the other individuals named in this action.  Accordingly, Plaintiffs and many other

shareholders have been forced to institute proceedings against these parties in the U.S.

9.    In August 2001, ZCM commenced an action in the Northern District of Illinois

against several culpable parties in this scheme, including Oceanic, M.J. Select, MJD, MJFA, and

Martin James Capital Management, Inc. ("Martin James), the purported investment manager of

M.J. Select, and the general partner of MJD and MJFA (the "Original ZCM Action").

10.    All claims against M.J. Select in that action have been stayed pending a proceeding

in the U.S. Bankruptcy Court for the Northern District of Illinois related to M.J. Select's

liquidation in the Bahamas.

11.    Plaintiffs have obtained a settlement amount from Martin James, MJD and MJFA

and are preparing to dismiss the action against them.

12.    The state claims filed against Oceanic were dismissed without prejudice after the

court dismissed with prejudice a federal securities fraud claim against Oceanic and Martin James.

Plaintiffs now reassert their state law claims, and assert new federal securities fraud and other

claims against Oceanic.

13. Coglianese's role, the extent of Oceanic's liability, and the involvement of all other parties named herein was not known to ZCM at the time it commenced the Original ZCM Action. The claims filed herein are the result of years of discovery and independent investigation into the facts and circumstances surrounding the fraudulent investment scheme.

14. In deposition testimony given in the Original ZCM Action: (1) Defendant Michael Coglianese admitted that he intentionally and fraudulently induced ZCM to purchase its interests in MJD and MJFA, and that the M.J. Select Offering Memoranda were materially false and misleading; he responded with false and misleading answers with respect to a number of issues set forth below in an effort to conceal his involvement with, and control over, M.J. Select; and (2) Defendants Oceanic and Terah Rahming admitted that (i) they knowingly and intentionally converted ZCM's investment in M.J. Select at the request of representatives of M.J. Select's purported investment manager, Martin James Capital Management Inc. ("Martin James"), whose representatives are business associates of Michael Coglianese, and (ii) Oceanic submitted materially false declarations in connection with its efforts to dismiss the Original ZCM Action.

15. Coglianese and Oceanic have therefore effectively admitted their liability on numerous counts alleged herein.

## II. JURISDICTION AND VENUE

16. This action arises in part under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

17. This Court has federal subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, federal diversity jurisdiction pursuant to 28 U.S.C. § 1332, and supplemental jurisdiction under 28 U.S.C. § 1367. The state law claims in this action are so related to the federal claim that they form a part of the

5

same case or controversy, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391.  A substantial part of the events or omissions giving rise to the claims occurred in this district.

19.     All defendants are subject to personal jurisdiction in this district.  Many defendants may be found in this district, are doing business in this district and/or are inhabitants of this district.  At the very least, each defendant, either in person or through an agent, transacts business in this district and/or has committed tortious acts both within and outside this district with injury resulting in this district and/or has made or performed a contract or promise substantially connected with this district.

20.     In connection with the acts and conduct alleged in this Amended Complaint, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, and telephone and wire communications systems.

### III. <u>THE PARTIES</u>

**A.     The Plaintiffs**

21.     Plaintiff ZCM Inc. is a Delaware corporation that has its principal place of business at One Chase Manhattan Plaza, New York, NY 10005.  At all relevant times, ZCM Inc. was one of the world's largest custodians of hedge funds.

22.     Plaintiff ZCM Bermuda is a Bermuda corporation and an affiliate of ZCM Inc. that operates as a holding company for offshore investments.

23.     Plaintiff ZCM Asset Holding LLC is a Delaware corporation that has its principal place of business at One Chase Manhattan Plaza, New York, NY 10005.  Plaintiff ZCM Asset

6

Holding LLC is a wholly owned subsidiary of ZCM Inc. that operates as a holding company for onshore investments.

24.     Plaintiff ZCM MFC is a Delaware corporation that has its principal place of business at One Chase Manhattan Plaza, New York, NY 10005. Plaintiff ZCM MFC is a wholly owned subsidiary of ZCM Inc. At all relevant times, ZCM MFC specialized in the offering and sale of derivative instruments.

**B.     The Coglianese Defendants**

25.     Defendant Michael Coglianese ("Coglianese") is a certified public accountant licensed under the Illinois Public Accounting Act. He is a citizen of the State of Illinois residing in Bloomingdale, Illinois.

26.     Defendant Michael Coglianese, CPA, PC ("MC C.P.A.") is an Illinois professional corporation with a last known principal place of business at 1 Tiffany Pointe, Bloomingdale, Illinois. Michael Coglianese is the President, Secretary, and sole owner of MC C.P.A.

27.     Defendant CCS Financial Services, Inc. f/k/a Commodity Compliance Services, Inc. ("CCS Inc.") is an Illinois corporation with a last known principal place of business at 1 Tiffany Pointe, Suite 104, Bloomingdale, Illinois 60108. Although Coglianese controls CCS Inc., his wife Gina Coglianese is the President and sole record owner of CCS Inc.

28.     Defendant Commodity Compliance Services International, Limited ("CCS Int'l") is a corporation organized by Michael Coglianese, David Lunn and John Burrows (former representatives of New World) under the laws of the Commonwealth of the Bahamas in or about January 1991.

29.     Defendants MC C.P.A., CCS Inc., and CCS Int'l are collectively referred to as the "Coglianese Accounting Entities."

7

30.     GLC Services, Corp. a/k/a GLC Services, Inc. f/k/a CCS Financial Services, Inc. ("GLC Services") is an Illinois corporation with a last known principal place of business at 1 Tiffany Pointe, Suite 104, Bloomingdale, Illinois 60108.  GLC Services engages in the business of making investment referrals for a fee and selling modified Microsoft software products.

31.     Defendant Gina Coglianese is the wife of Defendant Michael Coglianese, and a citizen of the state of Illinois, residing in Bloomingdale, Illinois.  Defendant Gina Coglianese is a bookkeeper (not a C.P.A.), and the President and Secretary of Defendants CCS Inc. and GLC Services.

**C.     The Oceanic Defendants**

32.     Defendant Oceanic is the administrator, registrar, and transfer agent of M.J. Select, with its principal place of business at TK House Bayside Executive Park, West Bay Street and Blake Road, Nassau, Bahamas.  Oceanic is the successor-in-interest to New World and Rawson Trust.  In its role as administrator, registrar and transfer agent of M.J. Select, Defendant Oceanic (and its predecessors-in-interest) transacted business through its agents in Illinois, and had systematic and continuous contacts with Illinois including:

a)      operation of an interactive website on the World Wide Web located at www.oceanic.bs on which Oceanic actively advertises and promotes its services to U.S. residents (including citizens of the State of Illinois), and asks them to request information about Defendant's Oceanic's fund, trust, corporate and investment services, which materials are then sent by Oceanic to the requestors;

b)      sending of electronic mail to U.S. residents (including citizens of the State of Illinois) which advertise Defendant Oceanic's website and contain a solicitation asking the recipient of the e-mail to visit Defendant Oceanic's website;

c)      maintaining a correspondent bank account at Barclays Bank in New York on behalf of Defendant Oceanic and M.J. Select in the United States and directing the wire transfer of funds through this bank account, including funds originating and ending in Illinois;

d)      frequent communications via telephone, e-mail, facsimile and mail with Michael Coglianese and the Coglianese Accounting Entities concerning the creation, incorporation, and promotion of M.J. Select;

e)      frequent communications via telephone, e-mail, facsimile and mail with Michael Coglianese and the Coglianese Accounting Entities retained by Oceanic and M.J. Select (1) to perform all accounting functions for M.J. Select (including, but not limited to, the calculation of daily and/or monthly Net Asset Values ("NAVs") for the fund), (2) to retain and direct the activities of the fund's auditor, and (3) to approve, authorize and/or direct wire transfers out of the M.J. Select bank accounts, all of which constitute a delegation of Defendants Oceanic's statutory, common law, and contractual duties under the ART Agreement (as defined in ¶89 herein);

f)      clearance of all transactions involving the transfer of funds into or out of M.J. Select's bank accounts, including in connection with redemptions, through Michael Coglianese, the Coglianese Accounting Entities, and Martin James in Illinois;

g)      transmitting information on redemption requests to Michael Coglianese, the Coglianese Accounting Entities, and Martin James in Illinois for clearance and approval and making telephone calls to Michael Coglianese, the Coglianese Accounting Entities, and Martin James in Illinois in connection therewith;

h)      frequent communications via telephone, e-mail, facsimile and mail with Michael Coglianese, the Coglianese Accounting Entities, and Martin James in Illinois regarding the daily operations of M.J. Select, the termination of M.J. Select's trading advisor, and the liquidation of M.J. Select;

i)      sending performance evaluations, and monthly and annual account statements and financial statements, that had been prepared by Michael Coglianese and/or the Coglianese Accounting Entities in Illinois, to the M.J. Select shareholders in Illinois and elsewhere in the U.S.; and

j)      contacting Michael Coglianese, the Coglianese Accounting Entities, and Martin James to obtain contact information for the M.J. Select shareholders, which information was compiled and maintained by these persons and entities in delegation of Defendant Oceanic's duties under the ART Agreement and the M.J. Select Offering Memorandum.

Oceanic also committed tortious acts both within and outside this district with injury resulting in

this district as set forth more fully below. (Charts 5 and 6; See also 11/21/02 Affidavit of Martin

James Allamian (hereinafter "Allamian Aff.") ¶ 51, annexed hereto as Exhibit 4.)

33.     Defendant Terah Rahming ("Rahming") is a citizen and resident of the Bahamas.

At all relevant times, Rahming was a director of M.J. Select, having been appointed in late 1999,

and was employed by Oceanic as the Manager of the Funds Department since 1997. In her role as

Director of M.J. Select and Manager of the Funds Department at Oceanic, Rahming transacted

business through her agents in Illinois, and had systematic and continuous contacts with Illinois,

including:

a)      sending of electronic mail to U.S. residents (including citizens of the State
of Illinois) which advertise Defendant Oceanic's website and contain a solicitation asking
the recipient of the e-mail to visit Defendant Oceanic's website;

b)      maintaining a correspondent bank account at Barclays Bank in New York
on behalf of Defendant Oceanic and M.J. Select in the United States and directing the wire
transfer of funds through this bank account, including funds originating and ending in
Illinois;

c)      frequent communications via telephone, e-mail, facsimile and mail with
Michael Coglianese and the Coglianese Accounting Entities retained by Oceanic and M.J.
Select to perform all accounting functions for M.J. Select, including, but not limited to, the
calculation of daily and/or monthly Net Asset Values ("NAVs") for the fund, and the
retention of the fund's auditor, and to approve, authorize and/or direct wire transfers out of
the M.J. Select bank accounts;

d)      clearance of all transactions involving the transfer of funds into or out of
M.J. Select's bank accounts, including in connection with redemptions, through Michael
Coglianese, the Coglianese Accounting Entities, and Martin James in Illinois;

e)      transmitting, or causing to be transmitted, information on redemption
requests to Michael Coglianese, the Coglianese Accounting Entities, and Martin James in
Illinois for clearance and approval and making telephone calls to Michael Coglianese, the
Coglianese Accounting Entities, and Martin James in Illinois in connection therewith;

f)      frequent communications via telephone, e-mail, facsimile and mail with
Michael Coglianese, the Coglianese Accounting Entities, and representatives of Martin
James in Illinois regarding the daily operations of M.J. Select, the termination of M.J.
Select's trading advisor, and the liquidation of M.J. Select;

g)      contacting Michael Coglianese, the Coglianese Accounting Entities, and
Martin James to obtain contact information for the M.J. Select shareholders;

10

      h)      sending, or causing to be sent, performance evaluations, and monthly and annual account statements and financial statements, that had been prepared by Michael Coglianese and/or the Coglianese Accounting Entities in Illinois, to the M.J. Select shareholders in Illinois and elsewhere in the U.S.; and

      i)      frequent communications via telephone, e-mail, facsimile and mail with Michael Coglianese and the Coglianese Accounting Entities in Illinois with respect to the numerous other funds created by Michael Coglianese, administered by Oceanic, and for which Rahming served as Director, including Blecmar Global Fund, Ltd. ("Blecmar"), Delta Limited, and Sonic Investments Ltd.

Rahming also committed tortious acts both within and outside this district with injury resulting in this district as set forth more fully below. (Charts 5 and 6; Ex. 4, Allamian Aff. ¶ 51.)

34.      Defendant Kenneth Clowes ("Clowes") is a citizen and resident of the Bahamas. At all relevant times, Clowes was a Director of M.J. Select, having been appointed in late 1999, and the Chief Operating Officer of Oceanic. In his role as Director of M.J. Select and Chief Operating Officer at Oceanic, Clowes transacted business through his agents in Illinois, and had systematic and continuous contacts with Illinois, including:

      a)      sending of electronic mail to U.S. residents (including citizens of the State of Illinois) which advertise Defendant Oceanic's website and contain a solicitation asking the recipient of the e-mail to visit Defendant Oceanic's website;

      b)      maintaining a correspondent bank account at Barclays Bank in New York on behalf of Defendant Oceanic and M.J. Select in the United States and directing the wire transfer of funds through this bank account, including funds originating and ending in Illinois;

      c)      communications via telephone, e-mail, facsimile and mail with Michael Coglianese, the Coglianese Accounting Entities, and representatives of Martin James in Illinois regarding the daily operations of M.J. Select, the termination of M.J. Select's trading advisor, and the liquidation of M.J. Select;

      d)      communications via telephone, e-mail, facsimile and mail with Michael Coglianese and the Coglianese Accounting Entities in Illinois with respect to the numerous other funds created by Michael Coglianese, administered by Oceanic, and for which Clowes served as Director; and

e) filing numerous declarations in the Original ZCM Action in the Northern District of Illinois on behalf of Oceanic and himself in furtherance of their efforts to conceal the true facts of this case and to prevent ZCM from initiating this action sooner.

Clowes also committed tortious acts both within and outside this district with injury resulting in this district as set forth more fully below. (Charts 5 and 6; Ex. 4, Allamian Aff. ¶ 51.)

35. Defendants Oceanic, Rahming and Clowes are collectively referred to as the "Oceanic Defendants."

**D. The Vorisek Defendants**

36. Defendant Vorisek & Company LLC ("Vorisek & Co.") is an Illinois limited liability company whose founding member is Defendant Jeffrey Allen Vorisek.

37. Defendant Jeffrey Allen Vorisek ("Vorisek") is a certified public accountant licensed under the Illinois Public Accounting Act and a citizen and resident of Illinois.

38. Defendants Vorisek and Vorisek & Co. are collectively referred to as the "Vorisek Defendants."

**E. The New World Defendants**

39. Global Arbitrage Development Limited ("GAD") is a foreign investment company, originally organized under the laws of the British Virgin Islands in 1995, and re-organized in or about February 2001 under the laws of the Commonwealth of the Bahamas. Its principal place of business is that of its administrator, Landmark Management, S.A.M. ("Landmark Monaco") at 17 Avenue de la Costa, BP 182, Monte Carlo, Monaco. The directors of GAD were Ambassador Directors Limited and then John Caseley and Ian Ledger. (Chart 8.)

40. Millennium Fund I, Ltd. ("Millennium") is a foreign investment company organized by David Lunn of New World under the laws of the Commonwealth of the Bahamas on or about February 27, 1998. From its inception until approximately April 2000, Millennium's

12

principal place of business was that of its administrator, Landmark Monaco at 17 Avenue de la Costa, BP 182, Monte Carlo, Monaco. Its directors were also Ambassador Directors Limited, replaced by John Caseley, Ian Ledger, and later Marcus Mahy. From April 2000 to the present, Millennium's principal place of business has been that of its new administrator Landmark Bermuda at 95 Front Street, Hamilton, Bermuda. Millennium's Registered Agent is Bank of Butterfield (Bahamas) Limited (formerly Leopold Joseph (Bahamas) Limited) in Nassau, Bahamas. Millennium is owned by its investment manager, Relms Limited. (Chart 8.)

41. Delta Limited ("Delta") is a foreign investment company organized by Michael Coglianese under the laws of the Commonwealth of the Bahamas in or about January 1994. At all relevant times, Delta's principal place of business was that of its administrator, New World and then Oceanic in Nassau, Bahamas. (Chart 6.) Its original directors were Falkirk, S.A. and Pantiles, S.A. and, upon information and belief, were later changed to include Terah Rahming.

42. Sonic Investments Ltd. ("Sonic") is a foreign investment company organized by Michael Coglianese and David Lunn under the laws of the Commonwealth of the Bahamas on or about November 3, 1994. At all relevant times, Sonic's principal place of business was that of its administrator, New World and then Oceanic in Nassau, Bahamas. Its directors include Terah Rahming, who has signatory authority over Sonic's bank account at Barclay's Bank in the Bahamas. (Chart 6.)

43. Relms Limited ("Relms") is a Bahamian corporation owed by David Lunn and incorporated by him on or about February 20, 1998, with principal places of business at Landmark Bermuda and the offices of its Registered Agent, Bank of Butterfield (Bahamas) Limited (formerly Leopold Joseph (Bahamas) Limited) in Nassau, Bahamas. Its directors were Ambassador Directors Limited, followed by Marcus Mahy and other officers and directors of

13

Landmark Bermuda or its affiliated law firm. An additional principal of Relms (and therefore Millennium) is allegedly an Australian individual named Giovanni Larisario. (Charts 5 and 8.)

44.     David Lunn ("Lunn") is a citizen and resident of the Bahamas. He was an employee of the New World Group, and a principal of New World and CCS Int'l. He incorporated M.J. Select and numerous other funds, including Sonic, at the direction of Coglianese. He is a principal and/or owner of Sonic, Millennium and Relms. (Chart 5.)

45.     Landmark Monaco is the successor-in-interest to New World Trust Corporation, NWT Gestion S.A.M. ("New World Monaco") and provides administrative services to various off-shore funds including GAD and Millennium. Its principal place of business is 17 Avenue de la Costa, BP 182, Monte Carlo, Monaco. (Charts 5 and 8.)

46.     John Caseley ("Caseley") is a citizen and resident of Monaco. He is a principal of Landmark Monaco and former employee of the New World Group. He is also a director of GAD, and a present or former director, principal, agent or representative of Millennium. (Charts 5 and 8.)

47.     Ian Ledger ("Ledger") is a citizen and resident of Monaco. He is the President of Landmark Monaco, a director of GAD, and a present or former director, principal, agent or representative of Millennium. (Charts 5 and 8.)

48.     Landmark Bermuda provides administrative services to various off-shore funds including Millennium and Relms with its principal place of business at 95 Front Street, Hamilton, Bermuda. (Charts 5 and 8.)

49.     Marcus J. Mahy ("Mahy") is a citizen and resident of Bermuda. He is the President and Managing Director of Landmark Bermuda, and a director of Millennium and Relms. (Charts 5 and 8.)

50.    Ambassador Directors Limited ("Ambassador") is a present or former director of

GAD and Millennium.  Its directors were John Caseley, Ian Ledger and/or Marcus Mahy.  Its

principal places of business include Landmark Monaco,17 Avenue de la Costa, BP 182, Monte

Carlo, Monaco, and Landmark Bermuda, 95 Front Street, Hamilton, Bermuda.

51.    GAD, Millennium, Delta, Sonic, Relms, Lunn, Landmark Monaco, Caseley,

Ledger, Landmark Bermuda, Mahy, and Ambassador are collectively referred to as the "New

World Defendants."  This Court has personal jurisdiction over each of the New World Defendants

because each such defendant, either in person or through an agent, was present (*i.e.*, doing

business) in Illinois, or at the very least transacted business in this district and/or has committed

tortious acts both within and outside this district with injury resulting in this district and/or has

made or performed a contract or promise substantially connected with this district.  The New

World Defendants had systematic and continuous contacts and communications with Michael

Coglianese, an Illinois resident whom they have admitted to be their agent (and who has admitted

to being their agent) and through whom they transacted business in Illinois.  (Charts 1-4, 6 & 8;

Ex. 4, Allamian Aff. ¶ 38).

## IV. FACTUAL BACKGROUND

**A.    <u>Coglianese's Relationships with the New World Defendants.</u>**

52.    In or about 1990 or 1991, Defendant Michael Coglianese traveled to the Bahamas

with a group of clients that allegedly included Giovanni Larisario, an Australian individual, and

Giovanni Palumbo, a tax lawyer with offices in Italy and Monaco, to interview potential fund

administrators for various off-shore investments funds that his clients wished to create.

53.    Coglianese met with David Lunn and John Burrows of Rawson Trust.  They

agreed to enter into a mutual referral arrangement whereby Coglianese would recommend that his

15

investment fund clients hire Rawson Trust (later New World and Oceanic) as their administrator, in exchange for their recommending and/or retaining Coglianese (or one of the Coglianese Accounting Entities), to perform all accounting for the funds.

54.     In furtherance of this agreement, Coglianese formed numerous off-shore investment companies including Blecmar, Delta, and Sonic, for which Rawson Trust (and later New World and Oceanic) served as administrator and Coglianese (or one of the Coglianese Accounting Entities) served as accountant.

55.     For each of these companies, Rawson Trust (and later New World and Oceanic) also supplied the nominal directors, first by incorporating two Panamanian entities called Falkirk, S.A. and Pantiles, S.A., and later replacing these entities with live directors, including Terah Rahming and Kenneth Clowes.

56.     As there was some hesitancy among foreign investment funds at the time to hire U.S. accountants, Coglianese and Lunn also formed CCS Int'l, a shell corporation serving as a Bahamian front for Coglianese and the other Coglianese Accounting Entities in Illinois. The office of CCS Int'l was that of Rawson Trust/New World, and Lunn served as Director of CCS Int'l. Coglianese and/or one of the other Coglianese Entities performed all work, and ultimately received all fees, billed by CCS Int'l. (Although this information was elicited from Coglianese during a subsequent deposition in the Original ZCM Action, during Coglianese's first deposition he claimed not to know whether an entity known as CCS Int'l existed.)

57.     On March 1, 1995, Rawson Trust officially changed its name to New World Trustees (Bahamas) Limited to "reflect the company's closer integration into the group of which it has formed a part for the last 10 years: the New World Group of Trust Companies with offices in

16

Monaco" and elsewhere. The New World Monaco office to which this press release refers is now known as Landmark Management, S.A.M or Landmark Monaco. (Chart 5.)

58.    Also in approximately 1990, Coglianese was introduced to the traders for GAD at a conference in Ireland, and to GAD's administrator, John Caseley, one of the principals of New World Monaco. GAD retained Michael Coglianese (through MC C.P.A.) as GAD's accountant and, thereafter, Coglianese operated as GAD's agent both in finding sources of investment capital for GAD and potential investments for GAD.

59.    Prior to the merger of New World and Oceanic, David Lunn left New World, went to work for Leopold Joseph (Bahamas) Limited, and formed Relms and Millennium. These entities originally shared the same corporate Director and Secretary as GAD, but later appointed various employees of Landmark Bermuda (to which Caseley and Ledger continued to act as consultants) to act as their officers and directors, including Marcus Mahy. Relms and Millennium retained Coglianese (and/or one of the Coglianese Accounting Entities) to serve as their accountant. (Charts 5 and 8.)

60.    Sonic, Delta, GAD, and Millennium also retained Coglianese to act as their agent/investment advisor whereby he agreed to perform due diligence on their behalf and to refer them to new investment opportunities. At least one of these entities, Delta, issued a power of attorney to Coglianese informing potential target companies that it would enforce any agreement entered into by Coglianese on its behalf. (Charts 1-4, 6 & 8; Ex. 4, Allamian Aff. ¶ 38.)

**B.    Coglianese's Relationship With the Southridge Entities and Other Investment Funds.**

61.    Meanwhile, back in the United States, Coglianese had formed personal and professional relationships with Steven Hicks and Daniel Pickett of Ridgefield, Connecticut.

17

62.     Hicks and Pickett were the owners and principals of Southridge, an investment management company that operated several highly risky and illiquid funds, including Dominion and Sovereign.  (Chart 7.)

63.     Dominion is an investment company organized under the laws of the Commonwealth of the Bahamas that, from its inception in 1995, has invested solely in unregistered securities (usually convertible debt in micro cap companies) sold pursuant to the safe harbor from registration provided under Section 4(2) of the Securities Act and Regulation D promulgated thereunder ("Reg D").  Because securities sold pursuant to Reg D are not registered with the U.S. Securities and Exchange Commission, they may not be freely resold.  This lack of liquidity makes it difficult to redeem or even value Reg D securities.  (Chart 7.)

64.     Sovereign is Dominion's U.S. counterpart, formed as a Delaware limited partnership in 1995 to offer the same investment strategy used by Dominion to U.S. investors. (Chart 7.)

65.     Southridge, Dominion and Sovereign (collectively, the "Southridge Entities") retained Coglianese and/or one or more of the Coglianese Accounting Entities to provide accounting services to Dominion and Sovereign from the inception of the funds until approximately 2000.  At some time in 2000, Coglianese helped Hicks and Pickett design a computer program to perform their accounting functions in-house.

66.     Coglianese also negotiated various fee sharing agreements with Hicks through Southridge and its predecessor-in-interest and/or affiliate, Commonwealth Capital Management, Inc. ("Commonwealth").  (Chart 3.)

67.     With respect to Dominion, Coglianese negotiated an agreement as agent for Sonic in which Commonwealth agreed to pay Sonic 25% of the management fees earned in connection

18

with any investments referred by Sonic in excess of $500,000. On information and belief, Coglianese at all times controlled the fee sharing payments to Sonic, and personally benefited from and/or received these payments, either as a result of his agency or by direct payment or assignment from Sonic. (Chart 3.)

68.     Coglianese, as agent for Sonic, referred Delta, GAD and Millennium to Dominion. Delta was Dominion's very first investor, and subsequently assigned its shares in Dominion to Millennium. In connection with these referrals and others, as accountant for Dominion and Southridge, Coglianese directed the payment to Sonic (both to its Barclays Bank account in the Bahamas and to Sonic's trading account at Thompson Kernaghan) of hundreds of thousands of dollars in referral fees. (Charts 2 and 3.)

69.     With respect to Sovereign, Coglianese negotiated a similar referral fee agreement as agent for IQ Data Consultants, LLC ("IQ Data"), a Nevada limited liability company. Coglianese, through GLC Services, performed computer-programming work for IQ Data and accepted as payment for its services an assignment of any and all referral fees due and owing from the Southridge Entities to IQ Data for its services as selling agent for Sovereign. (Charts 2 and 3.)

70.     Coglianese, on his own behalf, and as agent for IQ Data, GLC Services referred numerous investors to Sovereign, including his own Polar Cap I Fund and Steven Swenson. In connection with these and other referrals, as accountant for Sovereign and Southridge, Coglianese directed the payment to IQ Data and GLC Services of hundreds of thousands of dollars in referral fees. (Charts 2 and 3.)

71.     Coglianese was also introduced to Mark Valentine, the Chairman of Thomson Kernaghan & Co., a Canadian investment bank, and a former business partner of Hicks and Southridge. Mark Valentine retained Coglianese and/or one of the Coglianese Accounting

19

Entities to perform accounting services for Valentine's VC Capital Advantage Fund, a Bermuda venture capital fund. Hicks and Valentine were originally partners in VMH Management, the corporate general partner of the fund. Coglianese also negotiated a fee sharing agreement with respect to any investors that he (or any company for which he was acting as an agent) referred to the fund. (Chart 2.)

72.     On information and belief, Coglianese agreed to refer investors to Dominion, Sovereign and V.C. Advantage as a quid pro quo for the funds' retention of his accounting services. The basis of this belief is testimony of the investment manager of the Endeavor Fund – an un-related investment fund based in Atlanta, Georgia, that hired Coglianese as its accountant in exchange for Coglianese's agreement to refer investors to the fund. The Endeavor Fund fee sharing agreement expressly lists as among Coglianese's referred investors, Delta (Millennium's predecessor-in-interest), GAD, and any participants in the Hicks/Pickett trading program. (Charts 2 and 4.)

C.     **Coglianese's Relationship With the Vorisek Defendants.**

73.     Coglianese and Defendant Vorisek were previously both employed as auditors at the National Futures Association.

74.     Thereafter, each defendant pursued his own accounting and auditing practices. Coglianese and Vorisek also entered into a mutual referral arrangement.

75.     As a result of Coglianese's voluminous practice, he was able to refer a substantial amount of business to his friend Vorisek. Vorisek has testified in a deposition that approximately 40 percent of the Vorisek Defendants' audit work was referred by Coglianese.

20

76. At various times relevant to this complaint, at the suggestion or direction of Coglianese, the Vorisek Defendants were retained to audit, among other funds, M.J. Select, Asset Allocation, GAD, Millennium, Dominion and Sovereign.

**D.     The Formation and Operation of M.J. Select.**

77. Martin Allamian was a personal friend and business associate of Michael Coglianese. He was also the sole owner and principal of Martin James Capital Management, Inc. ("Martin James"), an investment manager that acted as the general partner for various U.S. investment funds controlled by Martin James, including Asset Allocation Fund, L.P. ("Asset Allocation"), MJD and MJFA.

78. Prior to February 1994, Defendant Michael Coglianese (on behalf of himself, the Coglianese Accounting Entities, and GAD), and John Caseley (on behalf of GAD) convinced Martin Allamian to join them in setting up an off-shore investment company that would use the Martin James "MJ" name branding, and that would raise money from U.S. investors on the basis of an investment strategy that would involve investing entirely in GAD. The name of the fund was to be M.J. Select Global, Ltd. (defined above as M.J. Select).

79. Coglianese told Martin James that: (1) Martin James would be hired as the fund's "investment manager," but its sole responsibility would be marketing the fund to Martin James' clients and other U.S. investors; (2) Coglianese would set up the fund and help manage the day-to-day affairs of the fund; (3) he and/or one or more of the Coglianese Accounting Entities would serve as accountant for the fund; and (4) Coglianese would be able to monitor the fund's performance because he was also the accountant for GAD.

80. Shortly after Martin James agreed to pursue the venture, Coglianese informed Martin James that he had selected Rawson Trust to act as administrator for their proposed fund,

and prepared a plan with Martin Allamian with respect to the unit structure, capitalization, principals, directors, banking, and monthly operations of the fund.

81.     On or about February 3, 1994, Coglianese, on behalf of himself and CCS Inc., sent a letter to David Lunn directing him to form M.J. Select as a multi-unit fund, with minimum capitalization, using the same principals and monthly operations as Blecmar. He instructed Lunn to provide directors for M.J. Select and to open a bank account at Barclays Bank in the Bahamas using $1,000 from the CCS Int'l account at Barclays to fund the initial deposit.

82.     M.J. Select was incorporated, according to the instructions of Coglianese, on or about February 7, 1994 under the International Business Companies Act of the Commonwealth of the Bahamas.

83.     At Defendant Michael Coglianese's direction, Rawson Trust originally appointed the two Panamanian corporations, Falkirk, S.A. and Pantiles, S.A. that served as directors for Delta and several other previously formed corporations to act as directors of M.J. Select. (Thereafter, in 1999, when Bahamian law indicated a preference for the appointment of directors who are natural persons, Oceanic, with the approval of Michael Coglianese, arranged for the appointment of two of Oceanic's own employees, Rahming and Clowes, to serve as the directors of M.J. Select.)

84.     Over the ensuing months, Defendant Michael Coglianese, on behalf of himself, the Coglianese Accounting Entities, Delta, GAD, and their officers, directors and administrators, together with Martin James, created the offering documents for M.J. Select, including the Offering Memorandum and the accompanying subscription and redemption documents.

85.     On or about November 25, 1994, Defendant Michael Coglianese, together with Martin James, promulgated M.J. Select's Offering Memorandum that stated, inter alia:

22

a.  Rawson Trust, as Administrator, Registrar and Transfer Agent would be responsible for "[t]he day to day business affairs of the Fund (exclusive of trading operations)";

b.  The Fund's objective was "to achieve long term capital appreciation utilizing investment advisors that will trade security options, bonds, mutual funds and related investments applying a "market neutral" trading approach utilizing arbitrage trading strategies";

c.  The Fund's initial trading advisor would be Global Arbitrage Development, Ltd.

d.  "The Shares are redeemable by Shareholders at the Net Asset value per Share as of the end of any month with 15 days prior written notice to the Fund"; and

e.  The Fund's investment manager, Martin James, would "select and allocate the Fund's trading assets among the trading Advisors . . . and continuously monitor and analyze the performance and trading characteristics of current and prospective advisors."

86.  On or about December 30, 1994, Defendant Michael Coglianese, on behalf of CCS Inc. sent a package to David Lunn at Rawson Trust that purported to enclose a copy of the M.J. Select Offering Memorandum and original investors' subscription agreements. In this letter, Michael Coglianese informed Rawson Trust that "CCS [Inc.] will do the accounting and send you a complete accounting package every month for your file."

87.  On March 1, 1995, David Lunn sent a letter to Coglianese in Illinois: (1) requesting that Coglianese send to New World a copy of the Offering Memorandum, which New World had apparently not yet seen, and (2) enclosing a draft Administration, Registrar & Transfer Agency Agreement to Michael Coglianese at CCS Inc. in Illinois for his review and approval. David Lunn wrote in hand on the letter to Coglianese that Oceanic "will execute [the Agreement] once you approve."

88.  Despite the clear documentary evidence that the Administration, Registrar & Transfer Agency Agreement was negotiated with, and approved by, Michael Coglianese in

23

Illinois, Oceanic and Clowes submitted an affidavit, dated September 17, 2001, to this Court incorrectly stating that "The negotiations regarding the Agreement took place in The Bahamas." (9/17/01 Clowes Aff. ¶ 5.)

89.     After the terms of the agreement were reviewed, negotiated and/or approved by Michael Coglianese in Illinois, in or about March 1995, M.J. Select entered into an Administration, Registrar & Transfer Agency Agreement with New World, which agreement was supplemented by the parties on September 24, 1997 (collectively referred to as the "ART Agreement").

90.     Under the terms of the ART Agreement, New World agreed to act for the benefit of the M.J. Select investors as Administrator, Registrar and Transfer Agent for M.J. Select. As Administrator, New World became responsible for "the processing, on an on-going basis, of all subscriptions, redemptions and transfers in respect of the Shares of the Fund [and] the making of payments in respect of redemptions . . . ." In connection with these duties, New World was authorized, among other things, to: (1) "request cheques drawn upon a bank account or accounts" and to "instruct the Fund's bank or banks to effect bank wire transfers" in order "to redeem Shares;" (2) "estimate the approximate total amount of funds required in respect of any payment for Shares to be redeemed as of the last business day of any month (a 'Valuation Date')"; and (3) "request the Fund to cause the liquidation of sufficient Securities, future or options positions to satisfy said redemptions in the event the Fund does not otherwise have sufficient cash on hand for this purpose." "Upon receipt of funds so realized," New World was obligated to "pay to a redeeming shareholder the Net Asset Value per Share of his redeemed Shares as of said Valuation Date, less any applicable redemption penalty."

24

91.     The ART Agreement required New World to exercise its duties "[i]n the manner
and as more fully described in [M.J. Select's] Offering Memorandum" which was incorporated by
reference therein.  Pursuant to the terms of the Offering Memorandum, shares of M.J. Select "are
redeemable by Shareholders at the Net Asset value per Share as of the end of any month with 15
days prior written notice to the Fund."  The Offering Memorandum also provided that: "Each
shareholder shall be paid the amount of its redemption as soon as practicable following the
effective date of the redemption.  However, the administrator shall have the right, exercisable
from time to time, to postpone the payment and effective date of any redemption for up to three
(3) months if the Administrator determines in good faith that the liquidation of the shareholder's
assets or investments in the fund would adversely affect the value of the shares in the fund.  Any
amount payable to the applicant in connection with the redemption of shares shall be paid by wire
upon the applicant's request at his expense."

92.     Effective May 1, 1998, Defendant Oceanic acquired New World and assumed all of
its rights, duties and obligations under the ART Agreement and the Offering Memorandum that
was incorporated by reference therein.  New World was legally merged into Oceanic as of
December 31, 1999.

93.     The assignment of the ART Agreement and Defendant Oceanic's assumption of the
obligations thereunder took place only after negotiations with, or the approval of, Michael
Coglianese in Illinois.

94.     The very first investor in M.J. Select, in 1995, was Martin James' Asset Allocation
Fund, which invested under account number 100.  Martin James made subsequent investments in
M.J. Select on behalf of its funds MJFA (under account number 227) and MJD (under account

number 231). As discussed more fully below, Asset Allocation's ownership interests in M.J. Select, MJD and MJFA were subsequently transferred to ZCM.

95.     From the inception of the fund, M.J. Select's administrator and directors forwarded most, if not all, requests for information about the fund (including performance, size, and investment strategy) to Michael Coglianese. Michael Coglianese occasionally instructed the administrator and directors how to respond to the inquiries, and occasionally responded to them himself. On numerous occasions, Michael Coglianese instructed the administrator not to provide any information to the requesting person or entity because they were not current investors or on the "waiting list."

96.     From the inception of the fund, transfers of funds into and out of M.J. Select's Barclays Bank account in the Bahamas had to be approved by Michael Coglianese. Michael Coglianese also instructed Oceanic as to the amount and timing of transfers of funds out of the Barclays account, including: (1) accounting fees to CCS Inc.; (2) management fees to Martin James; (3) administrative fees to Oceanic (and its predecessors-in-interest), and (4) all investments made by M.J. Select in various funds. (Chart 2.)

97.     On or about March 21, 1996, Michael Coglianese, on behalf of himself and CCS Inc., informed Oceanic that notwithstanding Oceanic's request to use Gomez & Gomez, a correspondent office of Grant Thornton, as auditor for M.J. Select, Michael Coglianese and CCS Inc. decided to retain Jeffrey A. Vorisek, C.P.A. as auditor for M.J. Select.

98.     Although the Offering Memorandum provided that M.J. Select would initially be invested only in GAD, and would engage in only "market neutral" trading, Coglianese directed and caused M.J. Select to invest not just in GAD, but also in at least the following funds: (1) Delta (which in turn made the very first investments in Dominion that were subsequently assigned to

26

Millennium for the benefit of M.J. Select), (2) Millennium, (3) Dominion (both directly and indirectly through GAD, Delta, and Millennium), (4) Sovereign (both directly and indirectly through Coglianese's Polar Cap I Fund), (5) VC Capital Advantage (indirectly through GAD), (6) Endeavor Fund (indirectly through GAD and Millennium), and (7) Worldmark One (another fund for which Coglianese or one of the Coglianese Accounting Entities served as accountant and/or received referral fees). (Chart 2.)

99. Coglianese's investment of M.J. Select's capital into Dominion, Sovereign and V.C. Advantage – all of which were Reg D, and/or highly illiquid venture capital funds – directly conflicted with the representations made by Coglianese and others in M.J. Select's Offering Memorandum and governing documents. Coglianese knew these investments were contrary to M.J. Select's governing documents because, among other reasons, he was the accountant for these funds and knew all about their investment strategies and underlying investments.

100. These investments were not disclosed to the investors of M.J. Select, nor was it possible for the investors to acquire this information through the exercise of reasonable due diligence.

101. Coglianese made, directed and controlled these investments in order to profit from the undisclosed management and incentive fee sharing agreements that he had negotiated with the New World Defendants. Coglianese's ownership interest in these entities, and the extent to which he profited from these relationships (other than through accounting profits received through his Coglianese Accounting Entities) cannot be determined without process of court.

102. Notwithstanding the above, a later version of the M.J. Select Offering Memorandum was promulgated on or about April 1, 2000, containing the following representations:

27

a. "The shares are redeemable by shareholders at the net asset value per share as of the end of any Calendar Quarter with thirty (30) days prior written notice to the Fund. Each shareholder shall be paid the amount of its redemption as soon as practicable following the effective date of the redemption."

b. Martin James, as Investment Manager of the company, will "continuously monitor and analyze the performance and trading characteristics" of the trading advisors of M.J. Select.

c. The net asset value of the M.J. Select shares will be available on a daily basis.

d. M.J. Select's investment strategy is to engage in "market neutral" arbitrage techniques including fixed income securities arbitrage, a "synthetic stock market hedge-yielding program," and volatility arbitrage.

103. At his first deposition in the Original ZCM Action, Coglianese provided false or misleading testimony that: (1) he did not know how Oceanic or its predecessor companies became the administrator for M.J. Select, or who appointed them; (2) he could not recall the names of any of the principals who asked him to select an administrator for M.J. Select; (3) he did not know the organizational structure or the principals of GAD; (4) no one from GAD, including John Caseley, had any role in the decision to set up M.J. Select; (5) Coglianese had "no clue" how GAD selected Dominion and Sovereign as investments; (6) he was not the contact person at the Coglianese Accounting Entities responsible for the M.J. Select account; (7) he did not authorize transfers of funds into and out of M.J. Select's bank accounts; (8) he does not and never had any business dealings with Southridge, Steve Hicks or Dan Picket, other than providing them with accounting services; (9) he never did any work for, was never affiliated with, and never had any connection of any kind to, Sonic; and (10) he does not know the identity of any of Sonic's principals.

104. At a subsequent deposition conducted by M.J. Select's Liquidators, Coglianese again falsely testified that he did not learn that GAD was invested in Dominion until he attended the depositions in the Original ZCM Action or received a letter so indicating from the Liquidators.

28

**E.    ZCM's Investment in M.J. Select, MJD and MJFA.**

105.    In or about May 2000, Martin James asked ZCM MFC to lend Asset Allocation the

necessary capital to provide 2:1 leverage for the fund's investments, including its investments in

M.J. Select, MJD and MJFA.

106.    ZCM MFC offered to provide that leveraging through a derivative instrument

known as a call option transaction or accreting strike basket transaction.  In such a transaction,

Asset Allocation's return is linked to the performance of a group or basket of hedge funds selected

by Martin James (a purely hypothetical or notional "Reference Portfolio") and, for every $1 that

Asset Allocation contributes to the transaction (the "premium payment"), ZCM MFC puts in $2 by

crediting the Reference Portfolio with three times the amount contributed by Asset Allocation.

The "Strike Price" (or amount contributed by ZCM MFC plus interest) continues to accrue interest

during the life of the transaction.  Upon termination of the transaction, if the value of the notional

Reference Portfolio exceeded the Strike Price, Asset Allocation would have the right to acquire

the value of the Reference Portfolio in exchange for payment of the Strike Price.

107.    Because ZCM intended to hedge ZCM MFC's exposure on the option transaction

by actually purchasing many of the securities in the defined Reference Portfolio, ZCM MFC

imposed certain requirements on the composition of the Reference Portfolio as a material

condition to its agreement to the option transaction.  ZCM MFC required that the Reference

Portfolio consist solely of cash, hedge fund interests, or marketable securities that satisfy certain

liquidity and diversity requirements ("Eligible Interests").  Each of the Eligible Interests in the

Reference Portfolio was required to have "effective redemption availability at least quarterly upon

no more than 60 days' prior written notice."

108.   In order to contribute its $1 to the transaction, Asset Allocation was permitted to make the necessary premium payments to purchase the option transaction, and to increase its participation in the option during the option term, either by paying cash or by assigning Eligible Interests of equivalent value to ZCM MFC.

109.   Asset Allocation told ZCM MFC that it wanted to pay the initial premium to acquire the option transaction by transferring to ZCM MFC its interest in several investments, including M.J. Select, MJD and MJFA.  Martin James also told ZCM MFC that it wanted these investments to be included in the notional Reference Portfolio.

110.   Because Martin James exercised a substantial amount of control over these funds in its role as general partner of MJD and MJFA, and investment manager of M.J. Select, ZCM MFC told Asset Allocation that it would only agree to accept an assignment of Asset Allocation's interest in these funds (and would only permit their inclusion in the notional Reference Portfolio) if it received written confirmations from Martin James, Oceanic (M.J. Select's administrator), and, with respect to MJD and MJFA, an independent accountant, stating that they would recognize the various assignments and ZCM MFC as the sole owner of 100% of the interests in these entities formerly held by Asset Allocation.

111.   To consummate the deal, Martin James faxed blank copies of the assignment confirmations for M.J. Select, MJD and MFJA to his friend, Defendant Michael Coglianese, who arranged for Rahming to sign the confirmation on behalf of M.J. Select and Oceanic.  Michael Coglianese also signed the assignment confirmations for MJD and MJFA as "President, CCS Financial Services, Inc., Accountant."  Copies of the fully executed assignment confirmations for M.J. Select, MJD and MJFA are attached hereto as Exhibits 1, 2 and 3 respectively.

112.    As Defendants Michael Coglianese and CCS Inc. knew, however, not one of these representations was true either at the time of the offer and sale of securities to Plaintiffs or at any point thereafter.  In fact, Defendant Michael Coglianese was not the President of CCS, neither he nor CCS were accountants for or had any oversight over MJD or MJFA, or had any intention of insuring that ZCM was recognized and treated as the sole owner of the MJD and MJFA partnership interests.

113.    Michael Coglianese admitted in a deposition in the Original ZCM Action that: (1) he was never President of CCS Inc., (2) neither he nor CCS Inc. was ever an accountant for MJD, MJFA (or even for Asset Allocation at any material time hereto) with oversight authority or the ability to ensure that ZCM MFC was recognized and treated as the sole owner of the MJD and MJFA partnership interests, (3) these false representations were made solely to induce ZCM MFC to accept the assignments of, and to purchase additional hedging investments in, these securities, and (4) Coglianese understood that ZCM's acceptance of the assignments and consummation of the Option Transaction would result in a substantial infusion of capital into M.J. Select.

114.    On May 31, 2000, based on these assignment confirmations, and in reliance on the representations made to ZCM MFC in the funds' various offering memoranda, copies of which were provided by Martin James, ZCM MFC agreed to accept an assignment of these funds, and to permit them to be included in the Reference Portfolio as Eligible Interests (the "Option Transaction").  As a result, investments in M.J. Select constituted 32.55% of the Reference Portfolio (both through direct investments and through MJD and MJFA's investments in M.J. Select).

115.    During the life of the Option Transaction, ZCM MFC acquired $4,511,689.99, $1,921,250.12, $5,019,506.60 in direct limited partnership and share interests in MJD, MJFA, and

M.J. Select, respectively, from Asset Allocation (which were subsequently assigned to ZCM Asset and ZCM Bermuda). In reliance on the assignment confirmations and the representations made in the funds' offering memoranda, ZCM Asset and ZCM Bermuda decided to retain these investments and purchased additional direct limited partnership and share interests in MJD, MJFA, and M.J. Select in the amounts of $3,676,824, $5,477,706, and $1,756,727.90, respectively, to hedge against ZCM MFC's exposure on the Option Transaction. Ex. 4, Allamian Aff. ¶¶ 16 & 19.

116.    Similarly, in connection with two additional un-related call option transactions, ZCM Bermuda accepted the assignment of, and purchased additional interests in, M.J. Select under Account Numbers 238 and 287 in the amounts of $5,270,870.40 and $1,516,375.90, respectively.

117.    According to the June 30, 2001 account statements issued by M.J. Select, the total value of Plaintiff ZCM Bermuda's direct share interests in M.J. Select was $14,235,206.78 ($7,301,199.75 in Acct. # 100, $5,270,870.82 in Acct. # 238, and $1,483,656.08 in Acct. # 287). Ex. 4, Allamian Aff. ¶ 19.

118.    According to the June 30, 2001 account statements issued by Martin James, Plaintiffs' partnership interests in MJD and MJFA were worth at least $6,835,324.00 and $3,205,711.64, respectively. Ex. 4, Allamian Aff. ¶¶ 17 & 18.

119.    At all times from May 31, 2000, to the present, ZCM has had sole, absolute and unconditional right, title and interest to the limited partnership interests in MJD and MJFA, and share interests in M.J. Select.

120.    At no time did ZCM ever transfer title to its interests in MJD, MJFA or M.J. Select back to Asset Allocation or Martin James. Ex. 4, Allamian Aff. ¶ 20.

32

**F.**     **Conversion of Plaintiffs' Interests in MJD and MJFA.**

121.     In March 2001, one of the core funds that Martin James had chosen for Asset

Allocation's Reference Portfolio, Six Sigma LLC ("Six Sigma"), entered into receivership and its

value for purposes of the option was written down to zero. As a direct result, the value of Asset

Allocation's hypothetical Reference Portfolio—and, hence, the value of its option—declined

dramatically, ultimately eliminating ZCM MFC's potential obligation to pay out on the option.

Pursuant to its contractual rights under the Option Transaction Agreement and Asset Allocation's

proposed portfolio revisions, ZCM redeemed the Reference Portfolio interests for purposes of

valuing the option, as well as the interests it had purchased to hedge its exposure thereto,

including its interests in MJD, MJFA and M.J. Select. Ex. 4, Allamian Aff. ¶¶ 23 & 24.

122.     In April 2001, ZCM issued requests to Martin James to fully redeem its interests in

MJD and MJFA. Ex. 4, Allamian Aff. ¶ 25.

123.     Martin James, in its capacity as general partner of MJD and MJFA, did liquidate

ZCM's interests in MJD and MJFA, including those funds' underlying investments in M.J. Select,

but, instead of paying the redemption proceeds to ZCM, Martin James transferred $7.45 million of

the proceeds to Asset Allocation's bank account and then paid almost $5 million of these proceeds

to its limited partners. Ex. 4, Allamian Aff. ¶¶ 26-30.

124.     Asset Allocation never had the right to receive these hedging interests as a result of

a physical settlement of the option transaction. Pursuant to the Option Transaction Agreement,

Asset Allocation would only have had a right to receive the securities (rather than the value of the

securities) if Asset Allocation: (1) exercised its option when the notional value of the Reference

Portfolio exceeded the Strike Price; (2) elected physical settlement (rather than cash settlement,

which was the default settlement method under the agreement); (3) provided written notice of

33

termination of the entire option transaction at least seven days prior to the last business day of any calendar quarter; and (4) paid to ZCM MFC the prorated Strike Price and, if prior to May 2005, an Early Termination Fee. Ex. 4, Allamian Aff. ¶ 16.

125.    Asset Allocation never made such an affirmative election and Asset Allocation never had any right to those assets. It is uncontested that Asset Allocation never paid ZCM the Strike Price and Early Termination Fee required to exercise its option to acquire the value of the Reference Portfolio (had the value of the Reference Portfolio exceeded the Strike Price). Asset Allocation thus has never had any right to demand delivery of any of the securities designated in the Reference Portfolio, including MJD, MJFA and M.J. Select. Ex. 4, Allamian Aff. ¶ 30.

126.    Contrary to the representations of Coglianese and CCS Inc., they were not independent accountants with supervisory powers over MJD and MJFA. At all times, Martin James exercised sole and exclusive control over ZCM's limited partnership interests and was able to convert them to his own use and the benefit of its Asset Allocation fund and shareholders.

## G.    Conversion of Plaintiff ZCM Bermuda's Interests in M.J. Select.

127.    On April 13, 2001, Plaintiff ZCM Bermuda instructed Defendant Oceanic, the administrator of M.J. Select, to fully redeem its position in Account #100 (2,613.145894 shares) by April 30. On April 19, Defendant Oceanic confirmed that Plaintiff's position would be liquidated and redeemed no later than May 31, 2001. However, Defendant Oceanic did not in fact redeem Plaintiff's shares as of that date or at any time to the present. Ex. 4, Allamian Aff. ¶ 50.

128.    On April 24, 2001, ZCM Bermuda further instructed Defendant Oceanic to fully redeem its position in Account # 238 (1,951.1202 shares) by May 30. On April 25, 2001, Defendant Oceanic represented that ZCM's position would be liquidated and redeemed as of May

31, 2001. However, Defendant Oceanic did not in fact redeem Plaintiff's shares as of that date or at any time to the present. Ex. 4, Allamian Aff. ¶ 50.

129.    With respect to ZCM Bermuda's position in Account # 287, on June 15 and July 23, 2001, ZCM Bermuda instructed Defendant Oceanic to redeem, respectively, 180.0 shares by June 30, and 351.120048 shares by July 31. Defendant Oceanic has not redeemed any of these shares either. Ex. 4, Allamian Aff. ¶ 50.

130.    The reason that Oceanic failed to redeem ZCM Bermuda's interests is that, in direct contradiction to its representation to ZCM Bermuda that it would recognize ZCM as the sole owner of the assigned interests in M.J. Select, Oceanic was cooperating with representatives of Martin James who, with the knowledge and cooperation of Coglianese, instructed Oceanic not to honor ZCM's redemption requests and instead to honor subsequently submitted redemption requests on behalf of Coglianese's and Martin James' friends, family and business associates.

131.    According to Oceanic's deposition testimony through Sharon Clare and Terah Rahming, and the documentary evidence produced in the Original ZCM Action, Sharon Clare discussed her discomfort with the situation with Rahming in or before July 19, 2001. As a result of these conversations Rahming, as Director of M.J. Select and Funds Manager of Oceanic: (1) requested a written explanation from Martin James (and simultaneously suggested that they respond with the potential three month delay period provided by the Offering Memorandum); (2) requested a legal opinion from Andrew M. Allamian (acting as M.J. Select's local attorney in Illinois) with respect to the potential grounds to support Martin James' request; and (3) requested a legal opinion from Graham Thompson & Co. (a well respected Bahamian law firm) with respect to ZCM Bermuda's right to priority status as a result of its April 2001 redemptions.

35

132.    Defendant Oceanic had no contractual or other basis to delay Plaintiff ZCM Bermuda's timely requests for redemption. Defendant Oceanic did not issue any notice of suspension of trading until June 30, 2001. Prior to that date, Defendant Oceanic did not make and could not have reasonably made any good faith determination that the redemption of Plaintiff's shares would adversely impact the interests of other shareholders in M.J. Select—particularly because Defendant Oceanic at the same time was processing on an accelerated basis improper preferential redemptions for insiders such as friends, family, investors and affiliates of Michael Coglianese and Martin James.

133.    As of June 30, 2001, ZCM Bermuda became a creditor of M.J. Select with respect to its redemption requests made in April 2001. As a creditor, ZCM Bermuda was entitled to priority in redemptions over all remaining shareholders. Defendant Oceanic knew that ZCM Bermuda was entitled to this priority creditor status and received confirmation of this in the legal opinion from Graham Thompson & Co.

134.    To date, Plaintiffs have not received any proceeds from any redemption of its common shares in M.J. Select. Defendant Oceanic deliberately refused to process Plaintiff's redemption requests in order to further Defendants' fraudulent conspiracy to transfer assets from M.J. Select to affiliates of Michael Coglianese and Martin James.

135.    Defendants Oceanic and Rahming, and Sharon Clare (a former employee of Oceanic), admitted in deposition testimony in the Original ZCM Action that Martin James (by and through its representatives Martin Allamian, James Manning, and Robert Paszkiet) expressly instructed them to defer any redemption from ZCM, and Defendants Oceanic and Rahming followed these instructions. At the same time, Defendants Oceanic and Rahming acted in concert with Michael Coglianese and Martin James to ensure the improper preferential early redemption

36

of the interests of Martin James, its affiliates, and friends, clients and affiliates of Michael

Coglianese.

136.    Defendants Oceanic and Rahming have further admitted in deposition that: (1) they

knew that ZCM Bermuda (and not Asset Allocation or Martin James) owned the interests at issue;

(2) they represented to ZCM Bermuda that they would honor its redemption requests; (3) they

failed to do so; (4) as administrator, Oceanic was and is responsible for the redemptions; (5) they

intentionally did not honor the redemptions at Martin James' request; (6) they knew that ZCM

Bermuda was a creditor of M.J. Select with priority status as a result of the legal opinion that it

sought from Graham Thompson; and (6) they nevertheless processed millions of dollars in

preferential payments and prevented ZCM Bermuda from recovering its interests in M.J. Select.

**H.      Fraudulent Accounting Statements and False Sworn Testimony Before the
         Bahamian and U.S. Courts.**

137.    From the inception of the M.J. Select Fund through May 2001, Defendants Michael

Coglianese, the Coglianese Accounting Entities, Oceanic, Rahming, and Clowes issued account

statements and financial statements to M.J. Select's shareholders, including Plaintiff ZCM

Bermuda, showing a positive performance for the fund.

138.    These defendants and the Vorisek Defendants also issued audited financial

statements confirming these results from the inception of the fund through year-end 2000.

139.    Defendants Coglianese and the Coglianese Accounting Entities knew or should

have known that the 2001 account and financial statements were materially false because the Net

Asset Value of the fund's investments in GAD and Dominion fell during this period. For

instance, notwithstanding a Dominion write down of 6.9% in March 2001 (representing over 80%

of M.J. Select's total investments), Coglianese and the Coglianese Accounting Entities reported a

1.4% increase in the Net Asset Value ("NAV") of M.J. Select for that month.

140.    In July 2001, Coglianese and the Coglianese Accounting Entities first issued

account and financial statements showing a 4.36% write down for M.J. Select, but then issued

revised statements reporting an extreme write down of 15.78%.

141.    Correspondence issued by Oceanic and Clowes suggests that the financial

statements for M.J. Select prepared by Coglianese and the Coglianese Accounting Entities were

inaccurate since at least January 2001. Therefore, all shareholders that redeemed in or after

January 2001 were likely redeemed at artificially inflated NAVs.

142.    Notwithstanding the actual trading losses sustained by M.J. Select during the

period and issuance of fraudulent accounting statements, Coglianese continued to direct, and cause

M.J. Select to pay, management fees to Martin James, accounting fees to Coglianese, and

unexplained fees to GLC Services. He also directed and caused M.J. Select to continue to invest

in GAD, Millennium, Dominion, and Polar Cap I Fund.

143.    As set forth above, Coglianese also required and permitted M.J. Select to issue

preferential redemptions at artificially inflated NAVs to friends, family, and business associates of

Coglianese and Martin James in the amount of at least $20 million, prior to the issuance of

corrected financial statements.

144.    On August 1, 2001, Oceanic and Rahming wrote to all shareholders of M.J. Select

to reveal that: (1) contrary to the Defendants' prior representations of redemption availability and

liquidity, M.J. Select (through GAD) was invested entirely in a non-liquid venture capital fund and

a non-liquid Regulation D fund, namely, VC Advantage and Dominion; (2) they had asked GAD

to retitle the investments in the name of M.J. Select; (3) they did not trust the revised June 2001

38

financial statements issued by CCS Inc.; and (4) they had received redemption requests in May 2001 that were in excess of available redemption proceeds.

145.    On August 14, 2001, Oceanic and Clowes sent a letter to Caseley, Martin Allamian, Andrew Allamian, and Coglianese demanding an explanation for the above matters.

146.    None of the Defendants ever disclosed to M.J. Select's shareholders: (1) M.J. Select's other investments in Delta, Millennium, Sovereign, Polar Cap I Fund, Endeavor Fund, or Worldmark One; (2) the extent of Coglianese's control over M.J. Select; or (3) the various referral and fee sharing agreements between Coglianese and the New World Defendants through which Coglianese, his related entities, and the New World Defendants profited at the expense of M.J. Select's shareholders.

147.    In September 2001, Defendants Rahming and Clowes petitioned the Supreme Court of the Commonwealth of the Bahamas to put M.J. Select into liquidation on the basis that its investment performance had not been adequately disclosed and was insufficient to satisfy redemptions.   The petition contained numerous misrepresentations, including that: (1) "[t]he entire funds of the Company were invested in Global Arbitrage Development Ltd."; (2) "[t]he net asset value of the Company is calculated by [CCS Int'l]"; and (3) the Company received ZCM Bermuda's redemption requests "in May, 2001" and that such requests were only for "shares totaling $3.9 million for value June 30, 2001." The petition sought the appointment of Wayne Aranha and Ishmael Lightbourne of PricewaterhouseCoopers as Joint Official Liquidators of M.J. Select.

148.    The August 2001 correspondence of Defendants Oceanic, Rahming and Clowes, and the winding up petition, indicate that these Defendants conducted no due diligence with respect to the fitness of the Coglianese Accounting Entities, Martin James, or GAD prior to

39

delegating all of their contractual, statutory, and common law duties to these entities, and were entirely in the dark with respect to the fund's investments in, and principals of, GAD, Dominion, and VC Advantage, and Coglianese's relationships and fee sharing agreements with the New World Defendants.

149.   Indeed, Defendant Rahming has testified that neither she nor Oceanic was aware that Coglianese (or the Coglianese Accounting Entities) or the Vorisek Defendants performed accounting and auditing services for GAD, Millennium, or Dominion.

150.   Defendant Rahming, as a Director of M.J. Select and an employee of Oceanic has also admitted in deposition testimony that in or about August 2001, she transferred $500,000 from M.J. Select's Barclays Bank account to Oceanic's own bank account in order to defray Oceanic's legal fees in defending against the Original ZCM Action.

151.   Rahming further testified that, even though this fact had been previously disclosed to the Joint Official Liquidators of M.J. Select, Wayne Aranha and Ishmael Lightbourne, and the Liquidators confirmed this fact in their November 16, 2001 letter to shareholders, Oceanic knowingly submitted a Declaration of Kenneth Clowes in the Original ZCM Action falsely swearing that: "Oceanic does not have any power to affect M.J. Select's assets; [and] M.J. Select's assets are under the exclusive control of the Bahamian liquidation proceeding." (11/20/01 Clowes Aff. ¶ 17, 18.)

152.   It was only after Rahming's deposition that Oceanic was forced to return the money to M.J. Select's Liquidators who reported to the shareholders that it had been returned. Oceanic and Clowes affirmed in this Court on March 7, 2002 that "[a]ny M.J. Select assets previously held or retained by Oceanic have been returned to M.J. Select, and are under the control of the Supreme Court of the Commonwealth of the Bahamas." (3/7/02 Clowes Aff. ¶ 2.)

40

**COUNT I**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Against Michael Coglianese, MC C.P.A., CCS Inc., and Gina Coglianese)**

153.    Plaintiffs reallege and thereby incorporate by reference the allegations in

paragraphs 1 to 152 above, and the allegations of Counts II through XVIII below, as if fully set

forth herein.

154.    Count I is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §

78j(b), and Securities and Exchange Act Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, against

Defendants Michael Coglianese, MC C.P.A., CCS Inc., and Gina Coglianese.

155.    On or about May 31, 2000, in connection with the purchase and sale of MJD and

MJFA limited partnership interests, each of Defendants Michael Coglianese and MC C.P.A. and

CCS Inc., acting through Michael Coglianese, made false and misleading statements and

omissions of material fact to Plaintiffs, and omitted to state material facts necessary to make their

statements to Plaintiffs not misleading, which included the following:

      a.      Falsely representing that Michael Coglianese was the President of CCS Inc.;

      b.      Falsely representing that Michael Coglianese, MC C.P.A., or CCS Inc. was
an independent accountant performing services for MJD, MJFA, and Asset
Allocation;

      c.      Failing to disclose that Martin James handled its own accounting with
respect to MJD, MJFA and Asset Allocation, without any independent
oversight or supervision; and

      d.      Falsely representing that Michael Coglianese MC C.P.A., and CCS Inc.
would each recognize ZCM MFC as the sole owner of the MJD and MJFA
limited partnership interests that ZCM MFC was purchasing from Asset
Allocation, while failing to disclose that this statement was part of an
opinion letter issued by MJD and MJFA's purported accountant for the
express purpose of misleading ZCM as to nature of the Coglianese's
relationship with Martin James and MJD, MJFA, and Asset Allocation.

156.     Each of the misrepresentations and omissions alleged above was material. Plaintiffs considered, and any similarly situated reasonable investor would have considered, them important in deciding whether to acquire the MJD and MJFA limited partnership interests. Plaintiffs would not have accepted the assignment of, or purchased, the MJD and MJFA limited partnership interests if they had known the true facts.

157.     Michael Coglianese, MC C.P.A., and CCS Inc. each knew that each of the misrepresentations and omissions alleged herein were false at the time they were made. Specifically, Michael Coglianese admitted under oath that he was not the president of CCS Inc. and that CCS has never served as an accountant for MJD, MJFA or Asset Allocation. Michael Coglianese also admitted under oath that he knowingly made these false representations at the request of Martin Allamian, who asked Michael Coglianese to make the false statements in order to induce Plaintiffs to purchase the MJD and MJFA limited partnership interests.

158.     In addition, Michael Coglianese, MC C.P.A., and CCS Inc. each knew or consciously disregarded that the statements set forth above were false or misleading. Because Michael Coglianese knew that he, MC C.P.A., and CCS Inc. did not serve as the accountant for MJD, MJFA, or Asset Allocation, Michael Coglianese knew or consciously disregarded that the letter sent to ZCM MFC was presented to ZCM as the opinion of an independent accountant, when in fact there was no independent accountant to MJD, MJFA, or Asset Allocation.

159.     Coglianese's, MC C.P.A.'s, and CCS Inc.'s knowledge or reckless disregard for the falsity of the representations and omissions alleged herein, and the existence of the true facts, is evidenced by the fact that, at the time these representations were made: (1) Martin Allamian contacted Michael Coglianese and told him that he needed him to sign the letters making the statements because ZCM MFC would not agree to enter into the Option Transaction Agreement or

42

purchase securities of MJD, MJFA and M.J. Select without the letters; (2) Martin Allamian knew and Coglianese confirmed by telling Martin Allamian that he was not the president of CCS Inc., his wife Gina was the president of CCS Inc., but that she could not sign the letters on behalf of CCS Inc. because she was out of town; (3) Martin Allamian knew and Michael Coglianese confirmed that neither he, nor MC C.P.A., nor CCS Inc. had ever been the accountant for MJD, MJFA, or Asset Allocation; (4) Martin Allamian told Michael Coglianese that he needed him to sign the letters anyway as a personal favor to him; and (5) Michael Coglianese agreed to sign the letters knowing that the increased leverage in the investments in M.J. Select would inure directly to his benefit. Michael Coglianese and Gina Coglianese have both testified under oath to the above facts.

160. Michael Coglianese, MC C.P.A., and CCS Inc. each had a motive to make the false and misleading statements discussed above. Michael Coglianese knew that, by inducing ZCM MFC to enter into the Option Transaction Agreement and inducing Plaintiffs to purchase the MJD and MJFA limited partnership interests, Asset Allocation would be able to triple its investment in M.J. Select. Thus, Michael Coglianese, MC C.P.A., and CCS Inc. had the opportunity to realize monetary gains from these investments because they actually increased the amount of capital in M.J. Select which in turn caused Michael Coglianese, the Coglianese Accounting Entities, and CCS Inc. to receive fee sharing profits in connection with the further investment of these funds in Dominion and Sovereign both, directly and indirectly, through GAD and Millennium.

161. Plaintiffs relied on each of the misrepresentations and omissions made by Michael Coglianese, MC C.P.A., and CCS Inc. in purchasing the MJD and MJFA limited partnership interests, and would not have purchased the MJD and MJFA limited partnership interests were it not for each of those misrepresentations and omissions.

162.     The misrepresentations and omissions made by Michael Coglianese, MC C.P.A., and CCS Inc. were made "in connection with" the purchase or sale of securities to Plaintiffs. Each of the misrepresentations was made with the specific purpose of inducing ZCM MFC to enter into the Option Transaction Agreement and inducing Plaintiffs to purchase the MJD and MJFA limited partnership interests, and concerned the fundamental attributes of those securities: characteristics and attributes that would affect the value of the security and would induce a purchaser to engage in purchases or sales of such investments.

163.     Gina Coglianese, as President of CCS Inc., has testified that Michael Coglianese informed her of the foregoing fraudulent misrepresentations and the resulting successful inducement of Plaintiffs' acquisition of partnership interests in MJD and MJFA.

164.     Defendants knew or should have known that Plaintiffs would continue to rely on the fraudulent misrepresentations made by Coglianese, MC C.P.A., and/or CCS Inc. and that Plaintiffs would purchase additional interests in MJD and MJFA in reliance thereon.

165.     As a result of the above knowledge and entanglement of Gina Coglianese and CCS Inc., Gina Coglianese and CCS Inc. had a duty to correct the misrepresentations. They nevertheless failed to do so and Plaintiffs purchased additional partnership interests in MJD and MJFA in reliance thereon.

166.     Gina Coglianese is also a control person of CCS Inc. within the meaning of Section 20(a) of the Exchange Act of 1934, 15 U.S.C. § 78t(a), and is therefore liable as a control person if not directly liable under Section 10(b). As President of CCS Inc., Gina Coglianese had the power and ability to control and influence, and did control and influence, directly and indirectly, the general day-to-day operations, policies, and decisions of CCS Inc. Gina Coglianese also possessed the power and ability to control and influence the specific transaction and conduct

44

giving rise to the actions by CCS Inc. that violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which included preparing and issuing the false assignment confirmations to Plaintiffs.

167.    As a direct and proximate result of the misrepresentations and omissions made by Michael Coglianese, MC C.P.A., CCS Inc., and Gina Coglianese, and their unlawful conduct in violation of Section 10(b) and Rule 10b-5 thereunder, Plaintiffs have been damaged and continue to be damaged, in an amount to be determined at trial, but not less than $10 million.

## COUNT II
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against Michael Coglianese, Rahming, and Oceanic)

168.    Plaintiffs reallege and thereby incorporate by reference the allegations in paragraphs 1 to 167 above, and the allegations of Counts III through XVIII below, as if fully set forth herein.

169.    Count II is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, against Defendants Michael Coglianese, Rahming, and Oceanic.

170.    In connection with the purchase and sale of securities issued by M.J. Select, Michael Coglianese made false and misleading statements and omissions of material fact to Plaintiffs, and omitted to state material facts necessary to make his statements to Plaintiffs not misleading, which included the following:

   a.    On or about November 25, 1994, and at numerous times thereafter, Michael Coglianese, through the M.J. Select Offering Memorandum, falsely represented that:

      (i)    M.J. Select's objective was "to achieve long term capital appreciation utilizing investment advisors that will trade, security options, bonds, mutual funds and related investments applying a

45

'market neutral' trading approach utilizing arbitrage trading strategies"; and

(ii) with respect to the shares purchased in reliance on the November 25, 1994 Offering Memorandum, that "[t]he Shares are redeemable by Shareholders at the Net Asset value per Share as of the end of any month with 15 days prior written notice to the Fund."

b.     On or about November 25, 1994, April 1, 2000, and at numerous times in between and thereafter, Michael Coglianese, through the M.J. Select Offering Memoranda, falsely represented that:

(i) Rawson Trust, New World, and Oceanic, as Administrator, Registrar and Transfer Agent would be responsible for "[t]he day to day business affairs of the Fund [M.J. Select] (exclusive of trading operations);"

(ii) the M.J. Select's investment manager would be a company organized by Martin J. Allamian which would "select and allocate the Fund's trading assets among the trading Advisors . . . and continuously monitor and analyze the performance and trading characteristics of current and prospective advisors"; and

(iii) the valuations (NAVs) of the shares of M.J. Select could be provided on a daily basis upon request.

c.     On or about April 1, 2000, and at numerous times thereafter, Michael Coglianese, through the M.J. Select Offering Memorandum, falsely represented that:

(i) M.J. Select's investment strategy is to engage in "market neutral" arbitrage techniques including fixed income securities arbitrage, a "synthetic stock market hedge-yielding program," and volatility arbitrage; and

(ii) with respect to the shares purchased in reliance on the April 1, 2000 Offering Memorandum, "[t]he shares are redeemable by shareholders at the net asset value per share as of the end of any Calendar Quarter with thirty (30) days prior written notice to the Fund. Each shareholder shall be paid the amount of its redemption as soon as practicable following the effective date of the redemption."

d.     On or about November 25, 1994, April 1, 2000, and at numerous times in between and thereafter, Michael Coglianese failed to disclose:

(i)   the existence of a discriminatory redemption policy, inconsistent with that stated in the Offering Memoranda, through which insider shareholders and their affiliates received accelerated and preferential redemptions of their shares of M.J. Select;

(ii)   that he had control over the transfer of funds into and out of the M.J. Select bank account and in fact directed payments to his own entities and affiliates, and various investment funds or brokerage accounts, contrary to M.J. Select's offering documents and without any prior informed approval from Oceanic or Martin James; and

(iii)   that he stood to profit from M.J. Select's improper direct or indirect investments in Millennium, Dominion, Sovereign, V.C. Advantage, and Endeavor Funds because of fee sharing agreements existing with respect to investment referrals to these funds.

171.   On or about May 31, 2000, in connection with the purchase and sale of securities issued by M.J. Select, Defendants Rahming, and Oceanic, made false and misleading statements and omissions of material fact to ZCM MFC, and omitted to state material facts necessary to make his statements not misleading, which included the following:

a.   Falsely representing that they would recognize ZCM MFC as the sole owner of 100% of the shares in M.J. Select that had previously been invested under the name of Asset Allocation, that were assigned on that date to ZCM MFC, and subsequently assigned to ZCM Bermuda;

b.   Falsely representing that ZCM MFC (and subsequently ZCM Bermuda) "as sole owner . . . will have all of the rights and privileges that normally accompany such ownership;"

c.   Failing to disclose the existence of a discriminatory redemption policy, inconsistent with that stated in the Offering Memoranda, through which insider shareholders and their affiliates received accelerated and preferential redemptions of their shares of M.J. Select; and

d.   Failing to disclose that ZCM's share interests were not effectively redeemable in accordance with the Offering Memoranda because Defendants Oceanic and Rahming intended to and would retain control over ZCM's share interests at the request of representatives of Martin James regardless of ZCM's demands for redemption.

47

172.    Defendants Michael Coglianese, Rahming, and Oceanic, with the intent to deceive, manipulate or defraud Plaintiffs, knew or recklessly disregarded the falsity of the material misrepresentations, and the materially misleading nature of the omissions, alleged above in connection with the offering and sale of the shares of M.J. Select.

173.    Each of the misrepresentations alleged above was false, and each omission was material. Plaintiffs considered, and similarly situated reasonable investor would have considered, them important in deciding whether to acquire the M.J. Select securities. The false representations regarding the liquidity and redeemability on short notice of the shares of M.J. Select were material to Plaintiffs' ability to manage its investment positions in M.J. Select. The false representations regarding the trading strategy, transfer limitations, and oversight responsibility of the Investment Manager were material to Plaintiffs' assessment of the security of its interests in M.J. Select. The failure to disclose Michael Coglianese's control over the transfer of funds, Martin James' control over the timing of redemptions, and the preferential redemption policy of M.J. Select, was materially misleading in that Plaintiffs were not put on notice that the value of their shares were, as a direct result of the discriminatory redemption policy, less than the value of shares of insiders and affiliates of Martin James. ZCM MFC and ZCM Bermuda would not have accepted the assignment of, or purchased, the M.J. Select securities if they had known the true facts or the existence of the omitted facts.

174.    Michael Coglianese, Rahming and Oceanic each knew that not one of these representations was true either at the time they were made or at the time of the offer and sale of securities to Plaintiffs.

175.    Michael Coglianese knew or recklessly disregarded at the time of the misrepresentations and at the time of the offering and sale of the securities that:

48

a.    The assets of M.J. Select were entirely invested directly, or indirectly through GAD and Millennium in Reg D and other highly illiquid funds that were not readily redeemable;

b.    GAD did not pursue an arbitrage trading strategy but placed the assets of M.J. Select with other funds, such as Dominion and VC Advantage, that in turn engaged in high risk investments;

c.    Martin James did not and could not continuously monitor the performance of GAD, but instead relied upon unaudited statements of value provided on no more than a monthly basis by Michael Coglianese and the Coglianese Accounting Entities;

d.    At the time of the offering of common shares to Plaintiffs and thereafter, transfers out of M.J. Select's bank account were routinely made at the direction of Michael Coglianese without the prior authorization or approval of Oceanic or Martin James;

e.    At the time of the offering of common shares to Plaintiffs and thereafter, Michael Coglianese routinely instructed Oceanic to transfer funds out of M.J. Select's bank accounts to: CCS Inc., GLC Services, GAD, Millennium, Sovereign, Dominion, Thompson Kernaghan, Polar Cap Fund I LP, Worldmark One, Delta, and other entities; and

f.    Michael Coglianese and companies represented by him routinely profited from M.J. Select's improper investments in Delta, Millennium, Dominion, Sovereign, and V.C. Advantage because of fee sharing agreements existing with respect to investment referrals to these funds.

176.    Michael Coglianese's knowledge or reckless disregard for the falsity of the representations and omissions, and the existence of the true facts, is evidenced by the facts that, at the time these representations were made: (1) Michael Coglianese was the accountant for, and had access to all relevant books and records (including underlying investment information) for, M.J. Select, GAD, Millennium, Dominion and Sovereign; (2) Michael Coglianese had instructed Oceanic and Barclays Bank to wire funds out of M.J. Select's bank account to CCS Inc., GLC Services, GAD, Millennium, Sovereign, Dominion, Thompson Kernaghan, Polar Cap Fund I LP, and other entities; and (3) Michael Coglianese in fact negotiated the fee sharing arrangements with the Southridge Entities on behalf of several related entities including Sonic, IQ Data, and GLC

Services. Steven Hicks, Daniel Pickett, and Defendants Michael Coglianese and Rahming have testified under oath to the above facts.

177. In May 2000 and at all times the misrepresentations and omissions were made, Michael Coglianese's motive to commit the fraudulent misrepresentations and omissions above was directly based on the economic benefit that he sought to gain through inducing Plaintiffs' leveraged investments, and other shareholders' investments, in M.J. Select. Michael Coglianese had the opportunity to realize monetary gains from these investments because they actually increased the amount of capital in M.J. Select which in turn caused Michael Coglianese, the Coglianese Accounting Entities, and/or GLC Services Corp. to receive fee sharing profits in connection with the further investment of these funds in Dominion and Sovereign both, directly and indirectly, through GAD and Millennium.

178. Rahming and Oceanic, knew or recklessly disregarded at the time of the misrepresentations and at the time of the offering and sale of the securities to Plaintiffs that:

    a.    Redemptions of share interests were entirely controlled by, and made solely at the direction of, Michael Coglianese and representatives of Martin James;

    b.    Oceanic had always obeyed the instructions of Michael Coglianese and representatives of Martin James, even though their instructions resulted in a discriminatory redemption policy, inconsistent with that stated in the Offering Memoranda; and

    c.    Transfers out of M.J. Select's bank account were routinely made at the direction of Michael Coglianese without the prior authorization or informed approval of Oceanic or Martin James.

179. Rahming's and Oceanic's knowledge or reckless disregard for the falsity of the representations and omissions, and the existence of the true facts, is evidenced by the facts that, at the time these representations were made: (1) Rahming and Oceanic had in fact followed each and every direction of Michael Coglianese and Martin James with respect to redemption payments

50

without ever questioning said instructions and without questioning whether or not such

redemption payments complied with M.J. Select's Offering Memorandum; and (2) Rahming and

Oceanic had in fact authorized payments to be made out of M.J. Select's bank account at the

direction of Michael Coglianese without the prior authorization or informed approval of Oceanic

or Martin James.

180.    In May 2000 and at all times the misrepresentations and omissions were made,

Rahming's and Oceanic's motive to commit the fraudulent misrepresentations and omissions

above was directly based on the economic benefit that they sought to gain by collecting monthly

fees under the terms of the ART Agreement, and similar agreements with respect to numerous

other entities formed by Coglianese, without having performed virtually any of the functions

required of them under that Agreement and after having delegated all such responsibilities to

Michael Coglianese, the Coglianese Accounting Entities and/or Martin James in Illinois.

Rahming and Oceanic had the opportunity to realize monetary gains from these investments

because they in fact received monthly fee payments from M.J. Select (at the direction of

Coglianese), and took additional funds from M.J. Select to defray their own legal expenses.

181.    Plaintiffs reviewed and reasonably relied on the misrepresentations and omissions

of Defendants Michael Coglianese, Rahming and Oceanic in acquiring and purchasing their share

interests in M.J. Select.

182.    The misrepresentations and omissions of Defendants Michael Coglianese, Rahming

and Oceanic were made "in connection with" the purchase or sale of the share interests to

Plaintiffs. Each of the misrepresentations were made with the specific purpose of inducing ZCM

MFC to enter into the Option Transaction Agreement and to purchase the M.J. Select common

shares (which shares were subsequently assigned to ZCM Bermuda in reliance on these

51

representations), and concerned fundamental attributes of these securities: characteristics and attributes that would affect the value of the security and would induce a purchaser to engage in purchases or sales of such investments.

183.    ZCM MFC and ZCM Bermuda would not have accepted the assignment of, and ZCM Bermuda would not have purchased, share interests in M.J. Select had they known the true facts and were it not for the false representations of Defendants Coglianese, Rahming and Oceanic.

184.    As a direct and proximate result of the misrepresentations and omissions made by Coglianese, Rahming, and Oceanic and their unlawful conduct in violation of Section 10(b) and Rule 10b-5 thereunder, Plaintiffs have been damaged and continue to be damaged in an amount to be determined at trial, but not less than $14,235,206.78.

**COUNT III**
**Violations of Section 20(a) of the Exchange Act**
**(Against Coglianese, Rahming, Clowes, and Oceanic)**

185.    Plaintiffs reallege and thereby incorporate by reference the allegations in paragraphs 1 to 184 above, and the allegations of Counts IV through XVIII below, as if fully set forth herein.

186.    Count III is brought, as an alternative pleading with respect to Count II, pursuant to Section 20(a) of the Exchange Act of 1934, 15 U.S.C. § 78t(a), against Defendants Coglianese, Rahming, and Oceanic.

187.    M.J. Select engaged in actions that violated Section 10(b) and Rule 10b-5 thereunder.

188.    In connection with the purchase and sale of M.J. Select securities, M.J. Select made false and misleading statements and omissions of material fact to Plaintiffs, and omitted to state

52

material facts necessary to make its statements not misleading to Plaintiffs, which included the

following:

a.   On or about November 25, 1994, and at numerous times thereafter, M.J. Select, through the M.J. Select Offering Memorandum, falsely represented that:

(i)   the fund's objective was "to achieve long term capital appreciation utilizing investment advisors that will trade, security options, bonds, mutual funds and related investments applying a "market neutral" trading approach utilizing arbitrage trading strategies"; and

(ii)  with respect to the shares purchased in reliance on the November 25, 1994 Offering Memorandum, that "[t]he Shares are redeemable by Shareholders at the Net Asset; value per Share as of the end of any month with 15 days prior written notice to the Fund."

b.   On or about November 25, 1994, April 1, 2000, and at numerous times in between and thereafter, M.J. Select, through the M.J. Select Offering Memoranda, falsely represented that:

(i)   Rawson Trust, New World, and Oceanic, as Administrator, Registrar and Transfer Agent would be responsible for "[t]he day to day business affairs of the Fund [M.J. Select] (exclusive of trading operations);"

(ii)  the M.J. Select's investment manager would be a company organized by Martin J. Allamian which would "select and allocate the Fund's trading assets among the trading Advisors . . . and continuously monitor and analyze the performance and trading characteristics of current and prospective advisors"; and

(iii) the valuations (NAVs) of the shares of M.J. Select could be provided on a daily basis upon request.

c.   On or about April 1, 2000, and at numerous times thereafter, M.J. Select, through the M.J. Select Offering Memorandum, falsely represented that:

(i)   the fund's investment strategy is to engage in "market neutral" arbitrage techniques including fixed income securities arbitrage, a "synthetic stock market hedge-yielding program," and volatility arbitrage; and

(ii)  with respect to the shares purchased in reliance on the April 1, 2000 Offering Memorandum, "[t]he shares are redeemable by shareholders at the net asset value per share as of the end of any

53

Calendar Quarter with thirty (30) days prior written notice to the
Fund. Each shareholder shall be paid the amount of its redemption
as soon as practicable following the effective date of the
redemption."

d.  On or about November 25, 1994, April 1, 2000, and at numerous times in
between and thereafter, M.J. Select failed to disclose:

(i)  the existence of a discriminatory redemption policy, inconsistent
with that stated in the Offering Memoranda, through which insider
shareholders and their affiliates received accelerated and preferential
redemptions of their shares of M.J. Select;

(ii) that Coglianese had control over the transfer of funds into and out of
the M.J. Select bank account and in fact directed payments to his
own entities and affiliates, and various investment funds or
brokerage accounts, contrary to M.J. Select's offering documents
and without any prior informed approval from Oceanic or Martin
James; and

(iii) that Coglianese stood to profit from M.J. Select's improper direct or
indirect investments in Millennium, Dominion, Sovereign, V.C.
Advantage, and Endeavor Funds because of fee sharing agreements
existing with respect to investment referrals to these funds.

189.  M.J. Select, with the intent to deceive, manipulate or defraud the Plaintiffs, knew

or recklessly disregarded the falsity of the material misrepresentations, and the materially

misleading nature of the omissions, alleged above in connection with the offering and sale of the

shares of M.J. Select.

190.  Each of the misrepresentations alleged above was false, and the omissions were

material. Plaintiffs considered, and similarly situated reasonable investor would have considered,

them important in deciding whether to acquire the M.J. Select securities. The false representations

regarding the liquidity, redeemability on short notice, and daily valuations of the shares of M.J.

Select were material to Plaintiffs' ability to manage its investment positions in M.J. Select. The

false representations regarding the trading strategy, transfer limitations, and oversight

responsibility of the Investment Manager were material to Plaintiffs' assessment of the security of

54

its interests in M.J. Select. The failure to disclose Coglianese's control over the transfer of funds,

Martin James' control over the timing of redemptions, and the preferential redemption policy of

M.J. Select, was materially misleading in that Plaintiffs were not put on notice that the value of

their shares were, as a direct result of the discriminatory redemption policy, less than the value of

shares of insiders and affiliates of Martin James. Plaintiffs would not have accepted the

assignment of, or purchased, the M.J. Select securities if they had known the true facts.

     191.   M.J. Select knew that not one of these representations was true either at the time

that were made or at the time of the offer and sale of securities to Plaintiffs.

     192.   M.J. Select knew or recklessly disregarded at the time of the misrepresentations

and at the time of the offering and sale of the securities that:

        a.     The assets of M.J. Select were entirely invested directly, or indirectly through GAD and Millennium in Reg D and other highly illiquid funds that were not readily redeemable and not susceptible to valuation on a daily basis;

        b.     GAD did not pursue an arbitrage trading strategy but placed the assets of M.J. Select with other funds, such as Dominion and VC Advantage that in turn engaged in high risk investments;

        c.     Martin James did not and could not continuously monitor the performance of GAD, but instead relied upon unaudited statements of value provided on no more than a monthly basis by Michael Coglianese and the Coglianese Accounting Entities;

        d.     At the time of the offering of common shares to Plaintiffs and thereafter, transfers out of M.J. Select's bank account were routinely made at the direction of Michael Coglianese without the prior authorization or approval of Oceanic or Martin James;

        e.     At the time of the offering of common shares to Plaintiffs and thereafter, Michael Coglianese routinely instructed Oceanic to transfer funds out of M.J. Select's bank accounts to: CCS Inc., GLC Services, GAD, Millennium, Sovereign, Dominion, Thompson Kernaghan, Polar Cap Fund I LP, Worldmark One, Delta, and other entities; and

      f.     Michael Coglianese and companies represented by him routinely profited from M.J. Select's improper investments in Delta, Millennium, Dominion, Sovereign, and V.C. Advantage because of fee sharing agreements existing with respect to investment referrals to these funds.

193.    M.J. Select's knowledge or reckless disregard for the falsity of the representations and omissions, and the existence of the true facts, is evidenced by the facts that, at the time these representations were made: (1) Coglianese was the accountant for, and had access to all relevant books and records (including underlying investment information) for, M.J. Select, GAD, Millennium, Dominion and Sovereign; (2) Coglianese had instructed Oceanic and Barclays Bank to wire funds out of M.J. Select's bank account to CCS Inc., GLC Services, GAD, Millennium, Sovereign, Dominion, Thompson Kernaghan, Polar Cap Fund I LP, Delta, Worldmark One, and other entities; and (3) Coglianese in fact negotiated the fee sharing arrangements with the Southridge Entities on behalf of several related entities including Sonic, IQ Data, and GLC Services.  Steven Hicks, Daniel Pickett, and Defendants Coglianese and Rahming have testified under oath to the above facts.

194.    M.J. Select's knowledge or reckless disregard for the falsity of the representations and omissions, and the existence of the true facts, concerning the redemption availability of Plaintiffs' interests, dual redemption policies of M.J. Select, and Defendants' intent to control, convert, and transfer Plaintiffs' interests in MJD, MJFA and M.J. Select, is evidenced by the facts that, at the time these representations and omissions were made: (1) M.J. Select had never strictly adhered to the redemption policies stated in the offering documents for M.J. Select; (2) M.J. Select had always redeemed its limited partnership interests whenever its principals so desired, without regard to when or if any redemption request had been received, as long as its principals agreed amongst themselves that such a redemption would be appropriate; (3) M.J. Select was invested in

56

illiquid securities; (4) there was no oversight of redemptions by an outside, independent, disinterested party, such as an accountant or auditor; and (5) there was no process in place to ensure that redemptions received on a timely basis would be honored in accordance with the funds' governing documents. Martin Allamian and Defendant Coglianese have testified under oath to the above facts.

195.    M.J. Select's knowledge or reckless disregard for the falsity of the representations and omissions, and the existence of the true facts, concerning the movement of funds in M.J. Select requiring the approval of Oceanic, GAD and CCS Inc., is evidenced by the facts that, at the time these representations were made: (1) Coglianese, M.J. Select, Rahming, and Oceanic were solely and fully in control over the movement of funds out of M.J. Select; (2) Coglianese had the power and had exercised the power to effect the transfer of funds out of M.J. Select without the approval of Oceanic, or GAD or CCS Inc.; and (3) Coglianese and GAD had the power and had exercised the power to affect the investment of M.J. Select's funds into various forbidden investments without the approval of Oceanic or even Martin James, the fund's investment manager. Martin Allamian and Defendants Coglianese and Gina Coglianese have testified under oath to the above facts.

196.    M.J. Select's knowledge or reckless disregard for the falsity of the representations and omissions, and the existence of the true facts, concerning M.J. Select's investment strategy and the investment of M.J. Select in non-liquid and Regulation D funds, is evidenced by the facts that: (1) M.J. Select was the joint brain-child of Michael Coglianese, John Caseley, and Martin Allamian; (2) M.J. Select's accountants and auditors were also performing accounting and audit work for GAD, Millennium, Dominion and Sovereign; (3) Coglianese and Martin Allamian specifically chose to create M.J. Select because of the inside knowledge available to M.J. Select as

57

a result of these relationships; (4) Coglianese, M.J. Select, Rahming, and Oceanic were directing the activities of Sonic, the referral agent that referred GAD and Millennium's investment in Dominion, and obtained significant fees in connection with such referrals; and (5) therefore, M.J. Select was fully aware of GAD's and thus M.J. Select's investments in illiquid and Regulation D funds. Martin Allamian and Defendant Coglianese have testified in depositions to facts one through three above.

197. Plaintiffs reviewed and reasonably relied on the misrepresentations and omissions of M.J. Select discussed above in purchasing shares of M.J. Select, and would not have purchased the shares of M.J. Select were it not for each of those misrepresentations and omissions.

198. The misrepresentations and omissions of Defendants were made "in connection with" the purchase or sale of the partnership and share interests to Plaintiffs. Each of the misrepresentations were made with the specific purpose of inducing ZCM MFC to accept the assignment of Asset Allocation's shares in M.J. Select (which shares were subsequently assigned to ZCM Bermuda) and inducing ZCM Bermuda to purchase shares of M.J. Select, and concerned fundamental attributes of these securities: characteristics and attributes that would affect the value of the security and would induce a purchaser to engage in purchases or sales of such investments.

199. As a direct and proximate result of the misrepresentations and omissions made by M.J. Select and its unlawful conduct in violation of Section 10(b) and Rule 10b-5 thereunder, Plaintiffs have been damaged and continue to be damaged in an amount to be determined at trial, but not less than $14,235,206.78.

200. Coglianese was a control person of M.J. Select within the meaning of Section 20(a) of the Exchange Act.

201.    Through his role in creating and promoting M.J. Select, his participation in the day-to-day operations of M.J. Select, his control over M.J. Select's bank accounts, and his role in creating and distributing the original M.J. Select Offering Memorandum, Coglianese had the power and ability to control and influence, and did control and influence, directly and indirectly, the general day-to-day operations, policies, and decisions of M.J. Select.

202.    Coglianese also possessed the power and ability to control and influence the specific transactions and conduct giving rise to actions by M.J. Select that violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which included preparing and distributing the M.J. Select Offering Memorandum to investors.

203.    Oceanic was a control person of M.J. Select within the meaning of Section 20(a) of the Exchange Act.

204.    As the administrator, registrar, and transfer agent of M.J. Select, Oceanic had the power and ability to control and influence, and did control and influence, directly and indirectly, the general day-to-day operations, policies, and decisions of M.J. Select.

205.    Oceanic also possessed the power and ability to control and influence the specific transactions and conduct giving rise to actions by M.J. Select that violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Oceanic in fact had a statutory duty under the laws of the Commonwealth of the Bahamas to ensure that the Offering Memoranda fully disclosed the nature and risks of an investment in M.J. Select and were not materially misleading. Because Oceanic controlled and performed the day-to-day operations of M.J. Select as the fund's administrator, register, and transfer agent of the fund, Oceanic had the power to suspend the day-to-day operations of M.J. Select unless M.J. Select corrected the M.J. Select Offering Memoranda, or discontinued their use in soliciting new investors.

206. Rahming and Clowes were control persons of M.J. Select within the meaning of Section 20(a) of the Exchange Act.

207. Through their positions as directors of M.J. Select, Rahming's position as Manger of Fund Services at Oceanic (which provided Rahming the responsibility of executing Oceanic's duties as administrator, register, and transfer agent of M.J. Select), and Clowes' position as Chief Operating Officer of Oceanic, Rahming and Clowes had the power and ability to control and influence, and did control and influence, directly and indirectly, the general day-to-day operations, policies, and decisions of M.J. Select.

208. Rahming and Clowes also possessed the power and ability to control and influence the specific transactions and conduct giving rise to actions by M.J. Select that violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. As directors of M.J. Select, Rahming and Clowes in fact had statutory duties under the laws of the Commonwealth of the Bahamas to ensure that the Offering Memoranda fully disclosed the nature and risks of an investment in M.J. Select and were not materially misleading. As a result of their respective positions at Oceanic and M.J. Select, Rahming and Clowes had the power to suspend the day-to-day operations of M.J. Select unless M.J. Select corrected the M.J. Select Offering Memoranda, or discontinued their use in soliciting new investors.

209. Accordingly, Coglianese, Oceanic, Rahming, and Clowes are each liable as control persons under Section 20(a) of the Exchange Act for M.J. Select's violations Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

**COUNT IV**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Against Delta, GAD, Millennium, and Sonic)**

210.     Plaintiffs reallege and thereby incorporate by reference the allegations in

paragraphs 1 to 209 above, and the allegations of Counts V through XVIII below, as if fully set

forth herein.

211.     Count IV is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §

78j(b), and Securities and Exchange Act Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, against

Defendants Delta, GAD, Millennium, and Sonic.

212.     In connection with the purchase and sale of M.J. Select securities, each of

Defendants Delta, GAD, Millennium, and Sonic, acting alone or with M.J. Select and Coglianese,

created and made false and misleading statements and omissions of material fact to Plaintiffs, and

omitted to state material facts necessary to make their statements not misleading to Plaintiffs,

which included the following:

   a.     On or about November 25, 1994, and at numerous times thereafter, each of
          Defendants Delta, GAD and Sonic, through the M.J. Select Offering
          Memorandum, falsely represented that:

          (i)  the fund's objective was "to achieve long term capital appreciation
               utilizing investment advisors that will trade, security options, bonds,
               mutual funds and related investments applying a 'market neutral'
               trading approach utilizing arbitrage trading strategies"; and

          (ii) with respect to the shares purchased in reliance on the November
               25, 1994 Offering Memorandum, that "[t]he Shares are redeemable
               by Shareholders at the Net Asset value per Share as of the end of
               any month with 15 days prior written notice to the Fund."

   b.     Each of Defendants Delta, GAD, and Sonic, on or about November 25,
          1994, April 1, 2000, and at numerous times in between and thereafter, and
          Defendant Millennium on and after April 1, 2000, through the M.J. Select
          Offering Memoranda, falsely represented that M.J. Select's investment
          manager would be a company organized by Martin J. Allamian which
          would "select and allocate the Fund's trading assets among the trading

Advisors . . . and continuously monitor and analyze the performance and trading characteristics of current and prospective advisors."

c.   On or about April 1, 2000, and at numerous times thereafter, each of Defendants Delta, GAD, Millennium, and Sonic, through the M.J. Select Offering Memorandum, falsely represented that:

   (i)   the fund's investment strategy is to engage in "market neutral" arbitrage techniques including fixed income securities arbitrage, a "synthetic stock market hedge-yielding program," and volatility arbitrage; and

   (ii)   with respect to the shares purchased in reliance on the April 1, 2000 Offering Memorandum, "[t]he shares are redeemable by shareholders at the net asset value per share as of the end of any Calendar Quarter with thirty (30) days prior written notice to the Fund."

d.   Each of Defendants Delta, GAD, and Sonic, on or about November 25, 1994, April 1, 2000, and at numerous times in between and thereafter, and Defendant Millennium on and after April 1, 2000, failed to disclose:

   (i)   that Delta, Millennium, and Sonic were acting as trading advisors for M.J. Select and its shareholders;

   (ii)   that Delta, GAD (the only disclosed trading advisor), Millennium, and Sonic were advising M.J. Select to invest in, and investing M.J. Select's capital in, Reg D and other highly illiquid venture capital funds in direct contradiction to the trading strategy, liquidity, and other representations set forth in the offering documents;

   (iii)   that shares of M.J. Select could not be redeemed in accordance with the terms of the offering documents;

   (iv)   that they, through their agent Coglianese, had control over the transfer of funds into and out of the M.J. Select bank account and in fact directed payments to his own affiliated entities, and various investment funds or brokerage accounts, contrary to M.J. Select's offering documents and without any prior informed approval from Oceanic or Martin James;

   (v)   that Martin James had little, if any, ability to select and allocate the Fund's trading assets among the trading advisors, and did not continuously monitor and analyze the performance and trading characteristics of current and prospective advisors;

      (vi) the extent of Michael Coglianese's control and involvement over the investments of M.J. Select, or his relationship with M.J. Select's investment advisors, and the funds in which M.J. Select invested;

      (vii) the existence of the various referral and fee sharing arrangements between and among the Coglianese Defendants, the Vorisek Defendants, the New World Defendants, and the Southridge Entities; and

      (viii) that Coglianese stood to profit from M.J. Select's improper direct or indirect investments in Dominion, Sovereign, V.C. Advantage, and Endeavor Funds because of fee sharing agreements existing with respect to investment referrals to these funds.

213. Each of the Defendants Delta, GAD, Millennium, and Sonic, with the intent to deceive, manipulate or defraud the Plaintiffs, knew or recklessly disregarded the falsity of the material misrepresentations, and the materially misleading nature of the omissions, alleged above in connection with the offering and sale of the shares of M.J. Select.

214. Each of the misrepresentations alleged above in paragraph 211 was false, and each omission was material. Plaintiffs considered, and any similarly situated reasonable investor would have considered, them important in deciding whether to acquire the M.J. Select securities. The false representations regarding the liquidity and redeemability on short notice of the shares of M.J. Select were material to Plaintiffs' ability to manage its investment positions in M.J. Select. The false representations regarding the trading strategy, transfer limitations, and oversight responsibility of the Investment Manager were material to Plaintiffs' assessment of the security of its interests in M.J. Select. Plaintiffs would not have accepted the assignment of, or purchased, the M.J. Select securities if they had known the true facts or the existence of the omitted facts.

215. Each of Defendants Delta, GAD, Millennium, and Sonic knew that not one of these representations was true either at the time that were made or at the time of the offer and sale of securities to Plaintiffs.

216. Each of Defendants Delta, GAD, Millennium, and Sonic knew or recklessly disregarded at the time of the misrepresentations and at the time of the offering and sale of the securities that:

   a.   The assets of M.J. Select were entirely invested directly, or indirectly through GAD, Delta, and Millennium, in Reg D and other highly illiquid funds that were not readily redeemable;

   b.   Neither GAD, nor Delta, nor Millennium, nor Sonic pursued an arbitrage trading strategy but placed the assets of M.J. Select with other funds, such as Dominion and VC Advantage that in turn engaged in high risk investments;

   c.   Martin James did not and could not continuously monitor the performance of GAD, Delta, Millennium, or Sonic, but instead relied upon unaudited statements of value provided on no more than a monthly basis by the Coglianese Accounting Entities and/or Michael Coglianese who was in fact an agent for GAD, Delta, Millennium and Sonic;

   d.   At the time of the offering of common shares to Plaintiffs and thereafter, transfers out of M.J. Select's bank account were routinely made at the direction of Michael Coglianese without the prior authorization or approval of Oceanic or Martin James;

   e.   At the time of the offering of common shares to Plaintiffs and thereafter, Michael Coglianese routinely instructed Oceanic to transfer funds out of M.J. Select's bank accounts to: CCS Inc., GLC Services, GAD, Millennium, Sovereign, Dominion, Thompson Kernaghan, Polar Cap Fund I LP, Worldmark One, Delta, and other entities; and

   f.   Michael Coglianese and companies represented by him, including Delta, GAD, Millennium, and Sonic, routinely profited from M.J. Select's improper investments in Delta, Millennium, Dominion, Sovereign, and V.C. Advantage because of fee sharing agreements existing with respect to investment referrals to these funds.

217. Each of Delta's, GAD's, Millennium's and Sonic's knowledge or reckless disregard for the falsity of the representations and omissions, and the existence of the true facts, is evidenced by the facts that, at the time these representations were made, their agent, Coglianese: (1) was the accountant for, and had access to all relevant books and records (including underlying

investment information) for, M.J. Select, Delta, GAD, Millennium, Dominion and Sovereign; (2)

had influence or control over, and full knowledge of, the investments made by M.J. Select, Delta,

GAD, Millennium and Sonic; (3) had instructed Oceanic and Barclays Bank to wire funds out of

M.J. Select's bank account to CCS Inc., GLC Services, GAD, Millennium, Sovereign, Dominion,

Thompson Kernaghan, Polar Cap Fund I LP, Delta, Worldmark One, and other entities; and (4)

negotiated the fee sharing arrangements with the Southridge Entities on behalf of several related

entities including Sonic, IQ Data, and GLC Services.

218.    Each of Delta's, GAD's, Millennium's and Sonic's knowledge or reckless

disregard for the falsity of the representations and omissions, and the existence of the true facts,

concerning M.J. Select's, Delta's, GAD's, and Millennium's investment strategy and the

investment of M.J. Select in non-liquid and Regulation D funds, is evidenced by the facts that: (1)

M.J. Select was the joint brain-child of their mutual agent, Michael Coglianese, John Caseley (a

principal of both GAD and Millennium), and Martin Allamian; (2) M.J. Select's accountants and

auditors were also performing accounting and audit work for GAD, Millennium, Delta, Dominion

and Sovereign; (3) their mutual agent, Coglianese, and Martin Allamian specifically chose to

create M.J. Select because of the inside knowledge available to M.J. Select as a result of these

relationships; (4) their mutual agent, Coglianese, was directing the activities of Sonic, the

investment advisor and referral agent that referred Delta, GAD and Millennium's investment in

Dominion, and also directed the investment in VC Advantage, and obtained significant fees in

connection with such referrals; (5) Sonic directed the investment of, and Delta, GAD and

Millennium in fact invested, M.J. Select's investment capital in Reg D and highly illiquid venture

capital funds, and Sonic, Delta, GAD and Millennium were fully aware that their own investment

strategies did not comport with those set forth in the M.J. Select offering documents; and (6)

65

therefore, each of Delta, GAD, Millennium and Sonic was fully aware of M.J. Select's investments in illiquid and Regulation D funds. Sonic's and Delta's knowledge of the misrepresentations and omissions is further evidenced by the fact that they shared the same directors and administrator as M.J. Select.

219.    Plaintiffs reviewed and reasonably relied on the misrepresentations and omissions of M.J. Select discussed above in purchasing shares of M.J. Select, and would not have purchased the shares of M.J. Select were it not for each of those misrepresentations and omissions.

220.    The misrepresentations and omissions of Defendants were made "in connection with" the purchase or sale of the partnership and share interests to Plaintiffs. Each of the misrepresentations were made with the specific purpose of inducing ZCM MFC to accept the assignment of Asset Allocation's shares in M.J. Select (which shares were subsequently assigned to ZCM Bermuda) and inducing ZCM Bermuda to purchase shares of M.J. Select, and concerned fundamental attributes of these securities: characteristics and attributes that would affect the value of the security and would induce a purchaser to engage in purchases or sales of such investments.

221.    As a direct and proximate result of the misrepresentations and omissions made by Delta, GAD, Sonic and Millennium and their unlawful conduct in violation of Section 10(b) and Rule 10b-5 thereunder, Plaintiffs have been damaged and continue to be damaged in an amount to be determined at trial, but not less than $14,235,206.78.

## COUNT V
### Violations of Section 20(a) of the Exchange Act
**(Against Lunn, Relms, Landmark Bermuda, Mahy, Landmark Monaco, Caseley, Ledger, and Ambassador)**

222.    Plaintiff ZCM Bermuda realleges and thereby incorporates by reference the allegations in paragraphs 1 to 221 above, and the allegations of Counts VI through XVIII below, as if fully set forth herein.

223.    Count V is brought pursuant to Section 20(a) of the Exchange Act of 1934, 15 U.S.C. § 78t(a), against Defendants Lunn, Relms, Landmark Bermuda, Mahy, Landmark Monaco, Caseley, Ledger, and Ambassador.

224.    This count realleges and therefore incorporates by reference all allegations of Count IV above as a predicate act of securities fraud on the part of Defendants Delta, GAD, Millennium, and Sonic in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

225.    Each of Defendants Lunn, Relms, Landmark Bermuda, Mahy, Landmark Monaco, Caseley, Ledger, and Ambassador, had actual knowledge of the false and misleading statements in the M.J. Select Offering Memoranda, and knew that these offering documents were being provided to potential investors to induce the purchase of share interests in M.J. Select.

226.    Lunn was a control person of Delta, Sonic, and Millennium (through its owner and investment manager, Relms), within the meaning of Section 20(a) of the Exchange Act.

227.    Through: (1) his role in creating, providing directors for, incorporating, and providing the articles and memorandum of association for Delta, Sonic and Millennium (through Relms); (2) acting first through Rawson Trust, then New World, as the administrator, registrar and transfer agent for Delta and Sonic; (3) acting through Leopold Joseph (Bahamas) Limited as the

registered agent for Millennium; (4) participating in the day-to-day operations of Delta, Sonic, and

Millennium; and (5) his control over Delta's, Sonic's, and Millennium's bank accounts, Lunn had

the power and ability to control and influence, and did control and influence, directly and

indirectly, the general day-to-day operations, policies, and decisions of Delta, Sonic, and

Millennium.

228.    Lunn also possessed the power and ability to control and influence the specific

transactions and conduct giving rise to the actions by Delta, Sonic, and Millennium that violated

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which included creating the

misrepresentations and failing to cure the omissions in, the M.J. Select Offering Memoranda.

Lunn could have refused to provide all of the services enumerated in paragraph 226 unless and

until Delta, Sonic, and Millennium corrected the misrepresentations and cured the omissions in

the M.J. Select offering documents.

229.    Relms was a control person of Millennium within the meaning of Section 20(a) of

the Exchange Act.

230.    Through: (1) its role as creator and majority, if not sole owner, of Millennium; (2)

its selection of the directors, administrator and registered agent for Millennium; (3) its role as

investment manager for Millennium; and (4) its participation in the day-to-day management and

operations of Millennium, Relms had the power and ability to control and influence, and did

control and influence, directly and indirectly, the general day-to-day operations, policies, and

decisions of Millennium.

231.    Relms also possessed the power and ability to control and influence the specific

transactions and conduct giving rise to the actions by Millennium that violated Section 10(b) of

the Exchange Act and Rule 10b-5 thereunder, which included creating the misrepresentations and

failing to cure the omissions in, the M.J. Select Offering Memoranda. Relms could have refused

to provide additional capital or to perform all of the services enumerated in paragraph 229 unless

and until Millennium corrected the misrepresentations and cured the omissions in the M.J. Select

offering documents.

232.    Landmark Bermuda, Mahy, Landmark Monaco, Caseley, Ledger, and Ambassador

were control persons of Millennium within the meaning of Section 20(a) of the Exchange Act.

233.    As the administrator, registrar, and transfer agent of Millennium, Landmark

Monaco, and then Landmark Bermuda, had the power and ability to control and influence, and did

control and influence, directly and indirectly, the general day-to-day operations, policies, and

decisions of Millennium.

234.    Landmark Monaco and Landmark Bermuda also possessed the power and ability to

control and influence the specific transactions and conduct giving rise to actions by Millennium

that violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Because they each in

turn controlled and performed the day-to-day operations of Millennium as the fund's

administrator, register, and transfer agent, each had the power to suspend the day-to-day

operations of Millennium unless and until Millennium corrected the misrepresentations and cured

the omissions in the M.J. Select offering documents.

235.    Each of Ambassador, Caseley, and Ledger were control persons of Millennium and

GAD, and Mahy was a control person of Millennium, within the meaning of Section 20(a) of the

Exchange Act.

236.    Through their positions as directors of GAD, each of Defendants Ambassador,

Caseley, and Ledger had the power and ability to control and influence, and did control and

influence, directly and indirectly, the general day-to-day operations, policies, and decisions of GAD.

237.    Through their positions as directors of Millennium, each of Defendants Ambassador, Caseley, Ledger, and Mahy had the power and ability to control and influence, and did control and influence, directly and indirectly, the general day-to-day operations, policies, and decisions of Millennium.

238.    Each of Defendants Ambassador, Caseley, Ledger, and Mahy also possessed the power and ability to control and influence the specific transactions and conduct giving rise to actions by GAD and Millennium (Mahy only with respect to Millennium) that violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

239.    As a result of their positions as directors of GAD and Millennium, each of Defendants Ambassador, Caseley, Ledger, and Mahy (only with respect to Millennium) had the power to suspend the day-to-day operations of GAD and Millennium unless and until they corrected the misrepresentations and cured the omissions in the M.J. Select offering documents.

240.    Accordingly, (1) Defendant Lunn is liable as a control person under Section 20(a) of the Exchange Act for Delta's and Sonic's violations Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; (2) Defendants Lunn, Relms, Landmark Monaco, Landmark Bermuda, Ambassador, Caseley, Ledger, and Mahy are liable as control persons under Section 20(a) of the Exchange Act for Millennium's violations Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and (3) Defendants Landmark Monaco, Ambassador, Caseley, and Ledger are liable as control persons under Section 20(a) of the Exchange Act for GAD's violations Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## COUNT VI
### Violations of Section 206 the Investment Advisors Act of 1940,
### (Against Delta, GAD, Millennium, and Sonic)

241.    Plaintiffs reallege and thereby incorporate by reference the allegations in

paragraphs 1 to 240 above, and the allegations of Counts VII through XVIII below, as if fully set

forth herein.

242.    Plaintiffs bring Count VI pursuant to Sections 206 and 215 of the Investment

Advisers Act, 15 U.S.C. §§ 80b-6 and 80b-15, against Defendants Delta, GAD, Millennium, and

Sonic, both derivatively, on behalf of M.J. Select, and independently as third-party beneficiaries

of the investment advisory contracts between M.J. Select and each of Delta, GAD, Millennium,

and Sonic.

243.    To the extent that this claim is asserted derivatively, demand on the board of

directors of M.J. Select is futile because, as alleged herein, the directors are complicit in the

wrongdoing and the Fund is in liquidation in the Bahamas.  Demand on the Joint Official

Liquidators of M.J. Select is futile because, after two years of fact discovery they have elected to

pursue claims against only the Allamian-affiliated parties, the Coglianese Defendants, and the

Vorisek Defendants, and not the Defendants named in this Count.

244.    Defendants Delta, GAD, Millennium, and Sonic each served as an investment

adviser to M.J. Select, Plaintiffs, and the other M.J. Select investors, within the meaning of the

Investment Advisers Act, 15 U.S.C. § 80b-2(11).

245.    Plaintiffs were the intended third-party beneficiaries of the investment advisory

contracts between M.J. Select and Delta, GAD, Millennium, and Sonic.

246.    Defendants Delta, GAD, Millennium, and Sonic each were required to serve M.J.

Select, Plaintiffs, and the other M.J. Select investors, in a manner in accordance with the

71

fiduciary standards set forth in, and required by, Section 206 of the Investment Advisers Act, governing the conduct of investment advisers.

247.    Each of Defendants Delta, GAD, Millennium, and Sonic breached its fiduciary duties owed to M.J. Select and Plaintiffs, by use of the mails or means or instrumentality of interstate commerce, by directly or indirectly engaging in a deceptive contrivance, scheme, practice, and course of conduct pursuant to which each defendant knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business which operated as fraud and deceit upon Plaintiffs and the other M.J. Select investors as described above. The purpose and effect of this scheme, practice, and course of conduct was to enrich Defendants Delta, GAD, Millennium, and Sonic, among other defendants, at the expense of Plaintiffs and the other M.J. Select investors.

248.    Defendants Delta, GAD, Millennium, and Sonic each had a duty (1) to disseminate accurate and truthful information, and to alert its investment advisory clients (including Plaintiffs) of inaccurate information, concerning M.J. Select and the use of investor funds; and (2) to act truthfully and uniformly in accordance with the representations made in the M.J. Select offering documents, and in accordance with each defendant's fiduciary responsibilities to Plaintiffs and the other M.J. Select investors.

249.    Defendants Delta, GAD, Millennium, and Sonic, through their agent Coglianese, had knowledge of and control over the contents of the M.J. Select offering documents.

250.    Defendants Delta, GAD, Millennium, and Sonic knew that the M.J. Select offering documents failed to disclose: (1) that Delta, Millennium, and Sonic were acting as trading and investment advisors; (2) that Delta, GAD (the only disclosed trading advisor), Millennium, and Sonic were advising M.J. Select to invest in, and investing M.J. Select's capital

in, Reg D and other highly illiquid venture capital funds in direct contradiction to the trading

strategy, liquidity, and other representations set forth in the offering documents; and (3) the

extent of Michael Coglianese's control and involvement over the investments of M.J. Select, or

his relationship with M.J. Select's investment advisors, and the funds in which M.J. Select

invested; and (4) the existence of the various referral and fee sharing arrangements between and

among the Coglianese Defendants, the Vorisek Defendants, the New World Defendants, and the

Southridge Entities.

     251.    Each of Defendants Delta, GAD, Millennium, and Sonic also failed to comply

with the trading strategy outlined in the M.J. Select offering documents.

     252.    Each of the omissions alleged above was material.  Plaintiffs considered, and any

similarly situated reasonable investor would have considered, them important in deciding

whether to acquire share interests in M.J. Select.  Plaintiffs would not have accepted the

assignment of, or purchased, the share interests if they had known the true facts.

     253.    As detailed above, Defendants Delta, GAD, Millennium, and Sonic each

participated in the fraud complained herein and prevented Plaintiffs and the other M.J. Select

investors from knowing of its multiple breaches of fiduciary duties including: (1) increasing its

profitability at the expense of Plaintiffs and the other M.J. Select investors by raising funds for

investment, and investing Plaintiffs' and the other M.J. Select investors' capital, in *inter alia*,

Dominion, Sovereign, and VC Advantage, through false and misleading M.J. Select offering

documents; and (2) placing its interests ahead of the investors of its investment advisory clients,

including Plaintiffs and the other M.J. Select investors.

     254.    As a result of each of the defendant's multiple breaches of its fiduciary duties

owed to Plaintiffs, Plaintiffs are entitled to rescind the investment advisory agreements between

M.J. Select and each of Delta, GAD, Millennium, and Sonic, and to recover on behalf of themselves as third-party beneficiaries or, in the alternative, on behalf of M.J. Select, any fees paid to Delta, GAD, Millennium, or Sonic in connection with the agreements.

## COUNT VII
### Violations of the Illinois Securities Law of 1953, 815 Ill. Comp. Stat. 5/12-13
### (Against Oceanic)

255.    Plaintiff ZCM Bermuda realleges and thereby incorporates by reference the allegations in paragraphs 1 to 254 above, and the allegations of Counts VIII through XVIII below, as if fully set forth herein.

256.    This Count is brought pursuant to the Illinois Securities Law of 1953, against Defendant Oceanic.

257.    Defendant Oceanic has engaged in a pattern and practice of fraudulent conduct in connection with the sale of shareholder interests in M.J. Select that includes all conduct alleged above, each allegation of which is realleged herein in connection with Defendant Oceanic's violation of the Illinois Securities Law.

258.    On or about August 3, 2001, Plaintiff became aware of Defendant Oceanic's wrongdoing as alleged above. Plaintiff repeatedly requested in writing and orally that Defendant Oceanic redeem the entirety of its interests in M.J. Select. Despite Plaintiff's many requests, Defendant Oceanic refused to act.

259.    On August 14, 2001, Plaintiff provided Oceanic with its statutory notice of election to void and rescind their investments in M.J. Select within six months after they had knowledge that the sale of those securities was voidable. On that date, Plaintiff served on Defendant Oceanic a complaint in the Original Action, which complaint alleged a number of causes of action against Oceanic, including many of the claims alleged herein. On or about March 25, 2002, the

74

Honorable George W. Lindberg dismissed Plaintiff's federal securities fraud claim (which differed from those claims alleged herein) against Oceanic for failure to state a claim, and dismissed all state law claims against Oceanic without prejudice in light of the dismissal of the federal claim.

260.     Plaintiffs again demand rescission by this Complaint.

261.     By the acts, practices, and courses of conduct herein alleged, Oceanic violated Section 12 of the Illinois Securities Law of 1953, 815 ILCS 5/12 as a principal violator or, in the alternative, as a controlling person that participated, aided, concurred and/or acquiesced in making the sale of shareholder interests in M.J. Select to Plaintiff within the meaning of 815 ILCS 5/13(A), and is therefore liable to Plaintiff ZCM Bermuda for rescission of its interests in M.J. Select and all other relief available to Plaintiff thereunder.

### COUNT VIII
### Common Law Fraud Under Illinois Law
### (Against Michael Coglianese, MC C.P.A., CCS Inc., Gina Coglianese, Rahming, Clowes, and Oceanic)

262.     Plaintiffs reallege and thereby incorporate by reference the allegations in paragraphs 1 to 261 above, and the allegations of Counts IX through XVIII below, as if fully set forth herein.

263.     In addition to the fraud alleged above and specifically incorporated by reference herein as a basis for this claim, Defendants Michael Coglianese, Rahming and Oceanic also arranged for, made, and allowed preferential distributions from M.J. Select to clients of Michael Coglianese and Martin James insiders (including, but not limited to, American Charitable Management Corp., Millennium Trust Co., Millennium Trust LLC, Paszkiet (through Millennium Trust), Giovanni Zanetta, Alan J. Liebman, Waterford Multiple Advisor Fund, John H. Waldock, as Trustee of John H. Waldock Trust and Daniel Spitzer, Trustee of Hero Trust) by allowing

75

numerous redemptions, before and after June 30, 2001, without complying with the redemption requirements set forth in M.J. Select's governing documents.

264.    Notwithstanding the above-mentioned representations, and while continuing such omissions, Defendants Rahming and Oceanic also permitted representatives of Martin James to transfer the stolen proceeds of the redemption of Plaintiffs' interest in MJD and MJFA in the amount of at least $1.5 million to Asset Allocation, by: (1) creating a separate share class of M.J. Select designated as Class B Shares at the direction of representatives of Martin James; (2) permitting Martin James to use the stolen proceeds to make subscriptions in outside funds, including Smart Offshore Fund, Ltd., Ontario Partners and Waterford Multiple Advisor Fund, in the name of, as-yet-unsubscribed, M.J. Select Global (B Shares); and (3) permitting Martin James to then transfer title of those interests to Asset Allocation. At no time did Oceanic inform Plaintiffs of this conduct.

265.    During this time period, Defendants Rahming and Oceanic also took affirmative steps to lull ZCM into a false belief its redemption requests were being honored to buy time in which Defendant Oceanic wrongfully and secretly diverted to Martin James, Asset Allocation, and various other insiders redemption proceeds that should have been transferred to Plaintiff ZCM Bermuda.

266.    On a bi-weekly basis from April 13, 2001 through July 31, 2001, then on a weekly basis from July 31, 2001 through approximately August 14, 2001, Defendants Oceanic and Rahming falsely represented to ZCM's representatives, including Tom Prunty, Jonathan Lewis and Shane Gadbaw, that ZCM Bermuda's redemption requests were being carried out, that underlying investments were being liquidated and that the resulting proceeds would be transferred to ZCM.

76

267.    Thereafter, during the course of the litigation in the Original ZCM Action, Oceanic and Clowes submitted a declaration signed by Kenneth Clowes swearing that Oceanic had no assets of M.J. Select in its custody or control, even though Oceanic and Clowes knew that Oceanic had converted to its own use substantial assets of M.J. Select's including by: (1) paying the law firm of Schopf & Wise a retainer in the amount of $15,065 out of M.J. Select's bank account on August 29, 2001; and (2) transferring $500,000 from M.J. Select's bank account to Oceanic's bank account allegedly to be used for legal expenses in connection with Oceanic's defense in the aforementioned legal action.

268.    Oceanic and Clowes also submitted a false or misleading declaration swearing that the ART Agreement had been negotiated entirely in the Bahamas.

269.    In addition to the fraudulent misrepresentations and omissions alleged in previous counts and above, Defendant Michael Coglianese also attempted to conceal his involvement in the M.J. Select fraud from Plaintiffs by providing false or misleading testimony in his deposition on November 8, 2001, with the intent to deceive Plaintiffs, that: (1) he did not know of a company by the name of Commodity Compliance Services International; (2) he did not know how Oceanic or its predecessor companies became the administrator for M.J. Select, or who appointed them; (3) he could not recall the names of any of the principals who asked him to select an administrator for M.J. Select; (4) no one from GAD, including John Caseley, had any role in the decision to set up M.J. Select; (5) he did not know who GAD's principals were; (6) he had "no clue" how GAD selected Dominion and V.C. Advantage as investments; (7) he was not the contact person at the Coglianese Accounting Entities responsible for the M.J. Select account; (8) he did not authorize transfers of funds into and out of M.J. Select's bank accounts; (9) he never did any work for, was never affiliated with, and never had any connection of any kind to, Sonic; (10) he does not know

77

who any of Sonic's principals are; and (11) he never had any business dealings with Southridge, Hicks or Pickett other than providing them with accounting services.

270. In addition to the fraudulent misrepresentations and omissions alleged in previous counts, Plaintiffs reasonably relied on Defendants Coglianese's, Rahming's, Clowes' and Oceanic's additional misrepresentations and omissions alleged in this Count in failing to take action earlier, including legal action, to block the defendants from converting and diverting assets and proceeds belonging to Plaintiffs. Plaintiffs' reliance was justifiable and reasonably foreseeable.

271. Each of the above misrepresentations and omissions was material in the sense that Plaintiffs considered them important and reasonably relied upon such statements and omissions in deciding not to initiate at an early date actions for the prompt recovery and redemption of Plaintiffs' interests, including the commencement of legal proceedings against Defendants Michael Coglianese, Rahming, Clowes and Oceanic, while permitting defendants to continue to have possession and control over Plaintiffs' investments and assets.

272. As a consequence of Plaintiffs' reliance on the foregoing misrepresentations and omissions made by the Defendants, Plaintiffs have been injured. Plaintiff ZCM Bermuda has been unable to redeem its shares in M.J. Select, which Defendant Oceanic converted to its own use by allowing preferential redemptions to friends, relatives and business acquaintances of Michael Coglianese and Martin Allamian, while unlawfully deferring Plaintiff's redemptions.

273. Each of Defendants Michael Coglianese, MC C.P.A., CCS Inc., Gina Coglianese, Rahming, Clowes, and Oceanic acted either with knowledge that the foregoing statements were false (and the omissions material) or recklessly disregarded the falsity of these statements and the materiality of the omissions.

78

274. The foregoing omissions were made, and misrepresentations were provided to Plaintiffs by each of Defendants Coglianese, MC C.P.A., CCS Inc., Gina Coglianese, Rahming, Clowes and Oceanic for the purpose of inducing reliance.

275. As a result of the Defendants' fraudulent conduct, Plaintiffs have been injured in an amount to be determined at trial.

### COUNT IX
### Conspiracy to Defraud
### (Against All Defendants)

276. Plaintiffs reallege and thereby incorporate by reference the allegations in paragraphs 1 to 275 above, and the allegations of Counts X through XVIII below, as if fully set forth herein.

277. By the actions, representations, omissions and courses of conduct described above, each of the Defendants knowingly and intentionally conspired, among themselves and with the Southridge Entities and Martin James, to defraud Plaintiffs as set forth more fully above by: (1) making fraudulent misrepresentations and omissions with respect to the existence of oversight from an independent accountant with respect to the limited partnership interests in MJD and MJFA; (2) making fraudulent misrepresentations and omissions with respect to the redemption availability and liquidity of share interests in M.J. Select; (3) converting and transferring Plaintiffs' ownership and share interests in MJD, MJFA, and M.J. Select to Asset Allocation and various friends, family and affiliates of Michael Coglianese and Martin James; (4) effecting preferential redemptions from M.J. Select while improperly deferring the redemptions of Plaintiff ZCM Bermuda's interests; (5) converting and transferring the proceeds from the redemption of Plaintiffs' interests in MJD and MFA to Asset Allocation by making subscriptions in the name of, as-yet-unsubscribed, "M.J. Select Global (B Shares)" and then transferring title of those interests

79

to Asset Allocation; and/or (6) obtaining secret profits and commissions in connection with the operation of M.J. Select and improper referrals of M.J. Select's investments both directly and indirectly through GAD and Millennium, to Dominion, Sovereign and V.C. Advantage, and other funds.

278.    In furtherance of this conspiracy, Defendants Michael Coglianese, MC C.P.A., CCS Inc., Rahming, Clowes, and Oceanic committed the overt acts set forth above and incorporated herein by reference, including, but not limited to: (1) falsely stating that Michael Coglianese was the president of CCS Inc., and that CCS Inc. was independent accountant to for MJD and MJFA that recognized ZCM MFC as 100% owner of the various interests transferred by Asset Allocation; (2) making fraudulent statements to ZCM in connection with the offer and sale of MJD, MJFA, and Asset Allocation securities; (3) effecting preferential redemptions of M.J. Select common shares; and (4) retaining control over ZCM Bermuda's share interests in M.J. Select, despite valid redemption demands made by ZCM Bermuda.

279.    Defendants Michael Coglianese, the Coglianese Accounting Entities, and the Vorisek Defendants also committed the following overt acts in furtherance of the conspiracy: (1) issuing fraudulent and/or negligent financial statements and reports to the shareholders of M.J. Select; (2) requesting and accepting thousands of dollars in payment for such fraudulent and/or negligent accounting or auditing services; and (3) destroying, or recklessly or negligently permitting the destruction of, records in their possession with respect to M.J. Select, GAD, and the Southridge Entities.

280.    Defendants GLC Services, Gina Coglianese, Sonic, and the New World Defendants knowingly and intentionally conspired with at least Defendants Michael Coglianese and the Coglianese Accounting Entities to defraud Plaintiffs as set forth above.

80

281.    In furtherance of this conspiracy, Defendants GLC Services, Gina Coglianese, Sonic, and the New World Defendants committed the following overt acts: (1) requesting and accepting hundreds of thousands of dollars in payment of management, incentive, and other fees paid by the Southridge Entities and others in connection with the referred investments of M.J. Select in GAD, Millennium, Dominion, Sovereign, V.C. Advantage, Polar Cap Fund; (2) requesting and accepting hundreds of thousands of dollars in payment of excessive and unearned administrative fees and directorship compensation in connection with the investment scheme outlined above; (3) concealing Michael Coglianese's involvement, ownership, or affiliation with the Coglianese Accounting Entities, the New World Defendants, and the Southridge Entities; and/or (4) attempting to shield Michael Coglianese from liability by accepting the transfer of assets into their names and/or funneling funds through their bank accounts.

282.    Each of the Defendants knew that the aims of the conspiracy had been accomplished because they each had personal knowledge of: (1) the misrepresentations and omissions made to induce the sale of MJD, MJFA, and M.J. Select; (2) Plaintiffs' purchase of ownership and share interests in MJD, MJFA, and M.J. Select in reliance on those misrepresentations and omissions; (3) Plaintiffs' requests for redemption of their interests in M.J. Select; (4) the conversion and transfer of Plaintiffs' interests in M.J. Select; (5) the preferential redemptions being effected to shareholders (other than Plaintiffs) in M.J. Select; (6) the improper investments made with the investment capital provided by Plaintiffs and other M.J. Select shareholders; and/or (7) the transfer of assets in M.J Select to Asset Allocation and other Martin James entities, friends and affiliates via M.J. Select (B Shares) investments.

283.    As set forth more fully above, each of the Defendants obtained direct monetary benefits from the conspiracy, including, but not limited to, administrative fees, referral fees,

81

management fees, trading advisor fees, incentive fees, compensation, accounting fees, audit fees, and all other benefits associated with operating as the administrator, registrar and transfer agent, accountant, auditor, trading advisor or sub-advisors of M.J. Select, and selling agents or representatives of the selling agents for certain of the Southridge Entities.

284. As a result of each the Defendant's participation in the conspiracy to defraud Plaintiffs, Plaintiffs have been injured in an amount to be determined at trial, but not less than $24 million, exclusive of costs and fees.

285. As a member of the conspiracy, each Defendant is jointly and severally liable for the full amount of damages sustained by Plaintiffs.

## COUNT X
### Unjust Enrichment
### (Against All Defendants)

286. Plaintiffs reallege and thereby incorporate by reference the allegations in paragraphs 1 to 285 above, and the allegations of Counts XI through XVIII below, as if fully set forth herein.

287. By the acts, practices, conducts and omissions herein-alleged, each of the Defendants has improperly and unjustly obtained property and assets that properly belong to Plaintiffs and which were misappropriated by the illegal conduct alleged herein.

288. Defendants obtained the Plaintiffs' property and assets under circumstances in which it is not just, equitable, or conscionable for Defendants to retain the Plaintiffs' property and assets. As a consequence of the foregoing, each of the Defendants has been unjustly enriched.

## COUNT XI
### Conversion
### (As to Defendant Oceanic)

289.     Plaintiff ZCM Bermuda realleges and thereby incorporates by reference the

allegations in paragraphs 1 to 288 above, and the allegations of Counts XII through XVIII below,

as if fully set forth herein.

290.     Plaintiff ZCM Bermuda properly submitted requests to redeem its share interests in

M.J. Select as more fully set forth in prior allegations. All conditions, if any, set forth in the M.J.

Select offering documents and Shareholders' Agreements were met, and no restrictions, if any,

contained therein were applicable to Plaintiff's redemption requests.

291.     Upon receiving Plaintiff ZCM Bermuda's redemption request, Defendant Oceanic

began to liquidate M.J. Select's underlying interests in GAD and Millennium to effectuate

Plaintiff's redemption.

292.     The following funds resulting from these liquidations were deposited into M.J.

Select's checking account at Barclays Bank: (1) $3,499,000.00 on May 8, 2001; (2) $3,099,990.00

on May 24, 2001; (3) $5,999,990.00 on June 5, 2001; and (4) $3,899,990.00 on July 18, 2001.

293.     Out of the $16,498,970.00 in proceeds, $14,235,206.78 (which equals the NAV of

all of Plaintiff ZCM Bermuda's interest in M.J. Select through each of its accounts as of June 30,

2001) at all times as of June 30, 2001, belonged to Plaintiff ZCM Bermuda. ZCM Bermuda had

the absolute and unconditional right to immediate possession of these proceeds. No one else had a

superior right to these funds.

294.     Notwithstanding ZCM Bermuda's numerous demands for these funds, at the

request of representatives of Martin James, Defendant Oceanic improperly retained control and

possession of such proceeds and refused to transfer the proceeds to ZCM Bermuda as required.

Instead, Defendant Oceanic diverted all of these proceeds, together with funds obtained from new additions of M.J. Select shareholders, for a total distribution of over $20 million, from M.J. Select to friends, family, affiliates and business acquaintances of Michael Coglianese and Martin James, notwithstanding the fact that they had submitted redemption requests subsequent to that of ZCM Bermuda.

295.    The unauthorized, intentional and wrongful diversion of Plaintiff's interest in the proceeds of redemptions of underlying investments of M.J. Select by Defendant Oceanic, in concert with Martin James, and the subsequent unauthorized and wrongful transfer of these proceeds to friends, family, investors in, and affiliates of, Michael Coglianese and Martin James constitute conversion.

296.    In addition, Defendant Oceanic wrongfully assisted Martin James in the conversion of the proceeds from the redemption of Plaintiffs interests in MJD and MJFA by: (1) creating a separate share class of M.J. Select designated as Class B Shares at the direction of representatives of Martin James; (2) permitting Martin James to use the stolen proceeds to make subscriptions in outside funds, including Smart Offshore Fund, Ltd. ($500,000 on June 29, 2001), Ontario Partners ($500,000 on July 27, 2001), and Waterford Multiple Advisor Fund ($500,000 on July 30, 2001), in the name of, as-yet-unsubscribed, M.J. Select Global (B Shares); and (3) permitting Martin James to then transfer title of those interests to Asset Allocation.

297.    As a result of Defendant Oceanic's conduct, Plaintiffs have been injured in an amount to be determined at trial, but not less than $14,235,206.78 exclusive of costs, fees and interest.

## COUNT XII
### Breach of M.J. Select Subscription Agreement and
### Administration, Registrar & Transfer Agency Agreement
### (Against Defendant Oceanic)

298. Plaintiff ZCM Bermuda realleges and thereby incorporates by reference the

allegations in paragraphs 1 to 297 above, and the allegations of Counts XIII through XVIII below,

as if fully set forth herein.

299. After negotiating the agreement with Coglianese in Illinois, in or about March

1995, M.J. Select entered into the ART Agreement with New World, which agreement was

supplemented by the parties on September 24, 1997.

300. Under the terms of the ART Agreement, New World agreed to act for the benefit of

the M.J. Select investors as Administrator, Registrar and Transfer Agent for M.J. Select. As

Administrator, New World became responsible for "the processing, on an on-going basis, of all

subscriptions, redemptions and transfers in respect of the Shares of the Fund [and] the making of

payments in respect of redemptions . . . ." In connection with these duties, New World was

authorized, among other things, to: (1) "request cheques drawn upon a bank account or accounts"

and to "instruct the Fund's bank or banks to effect bank wire transfers" in order "to redeem

Shares;" (2) "estimate the approximate total amount of funds required in respect of any payment

for Shares to be redeemed as of the last business day of any month (a 'Valuation Date')"; and (3)

"request the Fund to cause the liquidation of sufficient Securities, future or options positions to

satisfy said redemptions in the event the Fund does not otherwise have sufficient cash on hand for

this purpose." "Upon receipt of funds so realized," New World was obligated to "pay to a

redeeming shareholder the Net Asset Value per Share of his redeemed Shares as of said Valuation

Date, less any applicable redemption penalty."

85

301.   The ART Agreement required New World to exercise its duties "[i]n the manner and as more fully described in [M.J. Select's] Offering Memorandum" which was incorporated by reference therein.  Pursuant to the terms of the M.J. Select Offering Memorandum, shares of M.J. Select "are redeemable by Shareholders at the Net Asset value per Share as of the end of any month with 15 days prior written notice to the Fund."  The Offering Memorandum also provided that: "Each shareholder shall be paid the amount of its redemption as soon as practicable following the effective date of the redemption.  However, the administrator shall have the right, exercisable from time to time, to postpone the payment and effective date of any redemption for up to three (3) months if the Administrator determines in good faith that the liquidation of the shareholder's assets or investments in the fund would adversely affect the value of the shares in the fund.  Any amount payable to the applicant in connection with the redemption of shares shall be paid by wire upon the applicant's request at his expense."

302.   Effective May 1, 1998, Defendant Oceanic acquired New World and assumed all of its rights, duties and obligations under the ART Agreement and the M.J. Select Offering Memorandum that was incorporated by reference therein.  New World was legally merged into Oceanic as of December 31, 1999.

303.   The assignment of the ART Agreement and Defendant Oceanic's assumption of the obligations thereunder took place, at least in part, only after negotiations with, or the approval of, Michael Coglianese in Illinois.

304.   On or about May 31, 2000, and on several occasions thereafter, representatives of Martin James provided Plaintiff ZCM Bermuda with copies of the M.J. Select Offering Memorandum with an attached subscription agreement form.

86

305.    On or about May 31, 2000, ZCM MFC accepted an assignment of Asset Allocation's investments in M.J. Select through account number 100. This interest was subsequently transferred to ZCM Bermuda which in turn, on or about June 1, 2000, July 1, 2000, August 1, 2000, September 1, 2000, October 2, 2000, November 1, 2000, December 1, 2000, December 5, 2000, January 1, 2001, February 28, 2001, March 1, 2001 and April 1, 2001, in accordance with the subscription procedures set forth in the Offering Memorandum, completed subscription agreement forms and sent them to Defendant Oceanic in connection with the purchase of Class A shares of M.J. Select.

306.    Upon recognition of these assignments and acceptance of the foregoing funds, Plaintiff ZCM Bermuda became a shareholder in M.J. Select. Plaintiff ZCM Bermuda and M.J. Select thereby became parties to valid and enforceable Subscription Agreements comprising the executed subscription agreement forms and the M.J. Select Offering Memorandum incorporated by reference therein. Plaintiff ZCM Bermuda also became a third-party beneficiary to the ART Agreement between M.J. Select and Defendant Oceanic.

307.    On April 13, 2001, and April 24, 2001, pursuant to the redemption procedures outlined in the M.J. Select Offering Memorandum, Plaintiff ZCM Bermuda instructed Defendant Oceanic to redeem 2,613.145894 shares and 1,951.1202 shares, respectively, in M.J. Select, at the next opportunity, which Plaintiff indicated it believed to be April 30, 2001.

308.    Defendant Oceanic confirmed by letters of April 19, 2001 and April 25, 2001, respectively, that Plaintiff ZCM Bermuda's position would be liquidated and redeemed as of May 31, 2001. However, Defendant Oceanic did not redeem Plaintiff's shares as of that date, or at any time to the present.

87

309. On June 15, 2001 and July 23, 2001, Plaintiff ZCM Bermuda further instructed Defendant Oceanic to redeem 180.0 shares, and 351.120048 shares, respectively, in M.J. Select, at the next opportunity, which Plaintiff indicated it believed to be June 30 and July 31, respectively. Defendant Oceanic did not redeem Plaintiff's shares as of these dates, or at any time to the present.

310. Rather, acting in concert with and at the request of representatives of Martin James, and in breach of ZCM Bermuda's instructions and its own duties as Administrator, Defendant Oceanic indefinitely deferred any redemption of ZCM Bermuda's interests in M.J. Select. At the same time, Defendant Oceanic processed on an expedited basis redemption instructions from Michael Coglianese and Martin James for the benefit of their friends, family, affiliates and business acquaintances. Prior to June 30, 2001, Defendant Oceanic did not make, and could not reasonably have made, any good faith determination that the liquidation of ZCM Bermuda's shares would adversely affect the value of the shares in the fund.

311. While continuing to defer any redemption of Plaintiff's interests in M.J. Select, Defendant Oceanic wrongfully assisted Martin James in the conversion of the proceeds from the redemption of Plaintiffs interests in MJD and MJFA by: (1) creating a separate share class of M.J. Select designated as Class B Shares at the direction of representatives of Martin James; (2) permitting Martin James to use the stolen proceeds to make subscriptions in outside funds, including Smart Offshore Fund, Ltd., Ontario Partners, and Waterford Multiple Advisor Fund, in the name of, as-yet-unsubscribed, M.J. Select Global (B Shares); and (3) permitting Martin James to then transfer title of those interests to Asset Allocation.

312. Defendant Oceanic's improper refusal to redeem Plaintiff's interests, its preferential redemption of interests at the requests of Michael Coglianese and Martin James, and

its failure to prevent the fraudulent transfer to Asset Allocation of at least $1.5 million in assets belonging to Plaintiffs, all constitute breaches of Defendant Oceanic's duties under the ART Agreement and the Subscription Agreement incorporated therein by reference.

313.    Defendant Oceanic also breached the Subscription Agreements with ZCM Bermuda which requires the corporation to redeem the interests of investors at the end of any calendar quarter upon 30 days' written notice.

314.    As a natural and foreseeable consequence of their breaches of the Subscription Agreements and the ART Agreement, Defendant Oceanic has caused Plaintiff ZCM Bermuda damages in an amount to be determined at trial, but not less than $14 million exclusive of interest and costs.

315.    Plaintiffs further demand that Defendant Oceanic be required to return all fees that were: (1) paid to and retained by Defendant Oceanic in its capacity as Administrator, Registrar and Transfer Agent, in connection with any and all transactions involving the fraudulent transfer of Plaintiffs' interests in MJD and MJFA, the conversion of Plaintiff's interests in M.J. Select, or the preferential redemptions on behalf of Michael Coglianese, Martin James and their affiliates, friends and relatives; or (2) otherwise paid while Defendant Oceanic was in breach of the Subscription and ART Agreements for material non-performance of its contractual duties.

## COUNT XIII
### Intentional Interference With Contract
### (Against Oceanic and Rahming)

316.    Plaintiff ZCM Bermuda realleges and thereby incorporates by reference the allegations in paragraphs 1 to 315 above, and the allegations of Counts XIV through XVIII below, as if fully set forth herein.

317. At all relevant times, Defendants Oceanic and Rahming were aware of the existence and terms of the Subscription Agreements between Plaintiff ZCM Bermuda and M.J. Select, as well as the contractual obligations owed by M.J. Select to ZCM Bermuda as a result of those agreements.

318. Upon information and belief, Defendants Oceanic and Rahming intentionally induced M.J. Select to breach its contract with Plaintiff ZCM Bermuda by causing M.J. Select to fail to redeem the interests of Plaintiff ZCM Bermuda in compliance with the terms and conditions of the Subscription Agreements as outlined above.

319. As a result of M.J. Select's breach of contract, which was intentionally and unjustifiably induced by Defendants Oceanic and Rahming, Plaintiff ZCM Bermuda has been damaged in an amount to be determined at trial, but not less than $14 million exclusive of interest and costs.

## COUNT XIV
### Breach of Fiduciary Duty Under Common Law of Illinois
(Against Defendants Michael Coglianese, the Coglianese Accounting Entities, Oceanic, Rahming, Clowes, Lunn, Delta, Millennium, Mahy, GAD, Caseley, Ambassador Directors Limited, Ledger, Landmark Monaco, and Landmark Bermuda)

320. Plaintiff ZCM Bermuda realleges and thereby incorporates by reference the allegations in paragraphs 1 to 319 above, and the allegations of Counts XV through XVIII below, as if fully set forth herein.

321. At all relevant times, Defendants Michael Coglianese, the Coglianese Accounting Entities, Oceanic, Rahming, Clowes, Lunn, Delta, Millennium, Mahy, GAD, Caseley, Ambassador Directors Limited, and Ledger were fiduciaries of M.J. Select and owed fiduciary duties to ZCM Bermuda as a shareholder of M.J. Select as follows:

a.    As set forth in detail above, from 1995 until the appointment of the Joint Official Liquidators, Defendant Michael Coglianese was a de facto director and principal of M.J. Select, and he and the Coglianese Accounting Entities enjoyed a formal and informal role and position of domination and control over the operation of the Fund and Plaintiff's interest therein, including, but not limited to, valuation of the Fund and its shares, the authorization or directions of transfers of assets and redemptions, the selection and retention of the Fund's administrator, trading advisors, investments, and auditor;

b.    M.J. Select's Offering Memorandum identified Defendant Oceanic as the administrator, registrar and transfer agent responsible for the day-to-day business operations of the Fund, which included the handling and dispositions of all assets of the Fund, including Plaintiff ZCM Bermuda's investments, and Oceanic assumed all duties and responsibilities of the Fund's administrator, registrar and transfer agent pursuant to the ART Agreement and the applicable laws of the Commonwealth of the Bahamas;

c.    Rahming and Clowes were directors of the Fund from late 1999 until the Joint Official Liquidators took over in September 2001;

d.    Delta, Millennium and GAD were the Fund's trading advisors from 1995 until the Joint Official Liquidators took over;

e.    On information and belief, Rahming and Clowes were also the directors of Delta;

f.    Ambassador Directors Limited, Mahy, Caseley, and Ledger were directors of Millennium and/or GAD, the Fund's trading advisors as alleged above; and

g.    Lunn assisted Michael Coglianese in the creation of M.J. Select and CCS Int'l, created Millennium, and at all relevant times jointly controlled CCS Int'l and Millennium.

322.    As a result, ZCM Bermuda placed its trust and confidence in each of these Defendants.

323.    Each Defendant owed to ZCM Bermuda a duty (1) to ensure that M.J. Select invested consistent with the representations made in the Offering Memoranda; (2) of loyalty, candor and faithfulness; and (3) to avoid self-dealing.

91

324. Each Defendant in fact exercised control over Plaintiff's investments in the Fund and ordered and implemented the transfers of assets and funds pursuant to the operation of the Fund, including but not limited to the misappropriations and other wrongful disposition of funds alleged herein.

325. Defendants knowingly, recklessly and negligently breached their fiduciary duties to Plaintiff by: (1) failing to monitor the investments made by Delta, GAD and Millennium on behalf of M.J. Select and/or affirmatively investing the Fund's assets in unauthorized investments that Defendants knew or should have known were contrary to the terms of the M.J. Select Offering Memorandum as herein-alleged, (2) permitting and assisting in M.J. Select's assets being titled in the name of GAD, Millennium, and/or Delta, (3) permitting M.J. Select's assets to be misappropriated and lost in those unauthorized investments, (4) unduly multiplying the management, trading advisor, and incentive fees charged against the funds; (5) permitting the charging of excessive, undisclosed and/or unearned fees and commission based on false and inflated NAVs, (6) failing to inform Plaintiff and concealing until July 2001 that M.J. Select had been losing money since at least January 2001, (7) failing to inform Plaintiff that M.J. Select was invested in illiquid sub-funds and would not be able to timely honor redemption requests, (8) selling their loyalty and compromising their judgment by representing, providing services to and receiving fees, compensation and other things of value from funds and entities in which the Fund's assets were being invested, and failing to disclose these arrangements to Plaintiff, (9) assisting or participating in the preferential redemptions of certain investors at inflated and false NAVs, including the redemptions of inside investors, to the disadvantage and harm of Plaintiff, and/or (10) misappropriating and converting to their own use the proceeds from the redemption of Plaintiff's interests in the Fund and other assets of the Fund.

92

326.     Defendants Oceanic and Rahming further breached their fiduciary duties by simultaneously serving as the administrator and director, respectively, of M.J. Select, Delta (the company through which M.J. Select originally invested in Dominion), and Sonic, who knowingly referred Delta's (subsequently Millennium's) and GAD's investment to Dominion and received fees for such referrals.

327.     Defendants' breaches of fiduciary duty caused substantial damage to Plaintiff in an amount to be determined at trial, but in no event less than $24 million exclusive of costs and interest.

## COUNT XV
### Accounting Malpractice
### (Against Defendants Michael Coglianese, MC C.P.A., CCS Inc., CCS Int'l, Vorisek and/or Vorisek & Co.)

328.     Plaintiffs reallege and thereby incorporate by reference the allegations in paragraphs 1 to 327 above, and the allegations of Counts XVI through XVIII below, as if fully set forth herein.

329.     At all relevant times, Defendants CCS Int'l and/or Michael Coglianese, MC C.P.A., or CCS Inc. (either directly or though a sub-contract with CCS Int'l) were retained by Oceanic and/or M.J. Select to provide accounting services for M.J. Select and to calculate the NAV for the fund, and to issue monthly financial statements and shareholder account statements to the shareholders of M.J. Select.

330.     The purpose and intent of this accountant-client relationship was to benefit or influence the current and potential shareholders of M.J. Select, including Plaintiffs.

331.     Defendants Michael Coglianese, MC C.P.A., CCS Inc. and CCS Int'l were at all times aware that Oceanic and M.J. Select had notified the shareholders, including Plaintiff ZCM

93

Bermuda, in writing on numerous occasions, including through the M.J. Select offering documents and subsequent correspondence to all shareholders, that Oceanic and M.J. Select intended the M.J. Select shareholders, including Plaintiff ZCM Bermuda, to rely on these accountants' services.

332.    In connection with these accounting services, Defendants Michael Coglianese, MC C.P.A., CCS Inc. and CCS Int'l failed to satisfy the relevant professional standards of care, and instead acted fraudulently, intentionally, recklessly and/or negligently in providing false and inaccurate NAV calculations, financial statements and shareholder account statements to the M.J. Select shareholders, including Plaintiff ZCM Bermuda, at all times beginning at least on and after January 1, 2001.

333.    In addition, in connection with the inducement of ZCM MFC's acceptance of the assignment of Asset Allocation's interests in MJD and MJFA, Defendants Michael Coglianese, MC C.P.A., and CCS Inc. notified ZCM MFC in writing that it was allegedly retained to provide accounting services for MJD, MJFA and Asset Allocation and it intended for ZCM MFC to rely on these alleged services.

334.    The purpose and intent of this purported accountant-client relationship was to influence Plaintiffs to accept an assignment of Asset Allocation's interests in MJD and MJFA.

335.    In connection with these alleged accounting services, Defendants Michael Coglianese, MC C.P.A., and CCS Inc. failed to satisfy the relevant professional standards of care by: (1) notifying Plaintiffs of this purported accountant-client relationship for Plaintiffs benefit in writing; (2) intentionally making false statements and promises to Plaintiffs to induce them to accept an assignment of Asset Allocation's interests in MJD and MJFA; (3) promising Plaintiffs that they would oversee the actions of Martin James and Asset Allocation with respect to the

94

assigned interests in MJD and MJFA, and (4) permitting Martin James and Asset Allocation to convert the proceeds from the redemptions of Plaintiffs' interests in MJD and MJFA.

336.    At all relevant times, Defendants Vorisek and/or Vorisek & Co. were retained by M.J. Select and GAD to provide auditing services for M.J. Select and GAD to issue annual reports to the shareholders of M.J. Select and GAD, including Plaintiff ZCM Bermuda, reporting the results of their auditing procedures.

337.    Because M.J. Select was the only shareholder of GAD, the purpose and intent of each of these auditor-client relationships was to benefit or influence the current and potential shareholders of M.J. Select, including Plaintiff ZCM Bermuda.

338.    In issuing its annual report to the M.J. Select shareholders, and to M.J. Select as GAD's only shareholder, Defendants Vorisek and/or Vorisek & Co. identified the M.J. Select shareholders and notified them in writing that M.J. Select intended its shareholders, including Plaintiff ZCM Bermuda, to rely on these auditor's services.

339.    In connection with these auditing services, Defendants Vorisek and/or Vorisek & Co. failed to satisfy the relevant professional standards of care, and instead acted intentionally, recklessly and/or negligently in preparing and certifying the annual audits of M.J. Select and GAD to their shareholders, in that those reports improperly stated the value of the assets of M.J. Select and GAD and improperly certified the trading strategy utilized by M.J. Select and GAD.

340.    Defendants Vorisek and/or Vorisek & Co. failed to satisfy the relevant professional standards of care in connection with these audits by:

    a.    Failing to independently verify the truthfulness and accuracy of the information provided to them regarding M.J. Select's and GAD's investments for M.J. Select's 1999-2000 Report and 1998-1999 Report;

95

b.    Failing to disclose to M.J. Select or its shareholders their awareness in 1999 that GAD was invested in Reg D and otherwise illiquid sub-funds contrary to the reported trading strategy for M.J. Select; and

c.    Making material misrepresentations of fact in M.J. Select's 1999-2000 Report and 1998-1999 Report that M.J. Select was using a market-neutral trading approach using arbitrage strategies, when in fact they knew that M.J. Select's trading advisor, GAD, did not utilize trading strategies and practices consistent with the statements made in this annual report.

341.    Defendants Michael Coglianese, MC C.P.A., CCS Inc., CCS Int'l, Vorisek and Vorisek & Co. further failed to satisfy the relevant professional standards of care in connection with the services provided by them by failing to maintain and safeguard the books, records, and work papers relevant to these services for a period of time standard to the industry and, upon information and belief, intentionally destroyed all relevant documents to conceal the fraudulent activity and involvement of the individuals and entities as set forth more fully above.

342.    The accounting malpractice of Defendants Michael Coglianese, MC C.P.A., CCS Inc., CCS Int'l, Vorisek and/or Vorisek & Co. caused Plaintiffs substantial damages in an amount to be determined at trial.

**COUNT XVI**
**Breach of Contract**
**(Against Michael Coglianese, MC C.P.A., CCS Inc., Oceanic,**
**Vorisek and/or Vorisek & Co.)**

343.    Plaintiff ZCM Bermuda realleges and thereby incorporates by reference the allegations in paragraphs 1 to 342 above, and the allegations of Counts XVII through XVIII below, as if fully set forth herein.

344.    At all relevant times, there existed a contract between M.J. Select and Defendants Michael Coglianese, MC C.P.A., CCS Inc. and/or CCS Int'l, or in the alternative, a contract between M.J. Select and CCS Int'l, with a corresponding sub-contract between CCS Int'l and Michael Coglianese, MC C.P.A., and/or CCS Inc. to provide accounting services for M.J. Select,

96

to calculate the NAV for the fund, and to issue monthly financial statements and shareholder account statements to the shareholders of M.J. Select.

345.    Plaintiff ZCM Bermuda was a third-party beneficiary of those contracts because the intention of the contracting parties was to confer a direct benefit on the shareholders of M.J. Select, including Plaintiff ZCM Bermuda, including the receipt of monthly and annual financial statements and shareholder account statements.

346.    Pursuant to the terms of those contracts, Defendants Michael Coglianese, MC C.P.A., CCS Inc. and/or CCS Int'l in fact issued monthly and annual financial statements and shareholder account statements addressed to the shareholders of M.J. Select, including Plaintiff ZCM Bermuda.

347.    Defendants Michael Coglianese, MC C.P.A., CCS Inc. and/or CCS Int'l breached those contracts by providing false and inaccurate NAV calculations, financial statements and shareholder account statements to the M.J. Select shareholders, including Plaintiff ZCM Bermuda.

348.    At all relevant times, there existed annual contracts between M.J. Select and Defendants Vorisek and/or Vorisek & Co. to provide auditing services for M.J. Select and to issue annual reports to the shareholders of M.J. Select, including Plaintiff ZCM Bermuda, reporting the results of their auditing procedures.

349.    Plaintiff ZCM Bermuda was a third-party beneficiary of those contracts because the intention of the contracting parties was to confer a direct benefit on the shareholders of M.J. Select, including Plaintiff ZCM Bermuda, including the issuance to and receipt by those shareholders of audited financial statements and annual reports.

350.    Defendants Vorisek and Vorisek & Co. breached their contracts to prepare and certify the annual audits of M.J. Select to its shareholders, in that those reports improperly stated

97

the value of the assets of M.J. Select and improperly certified the trading strategy utilized by M.J.

Select. In particular, Defendants:

    a.    Failed to independently verify the truthfulness and accuracy of the information provided to him regarding M.J. Select's and GAD's investments for M.J. Select's 1999-2000 Report and 1998-1999 Report;

    b.    Failed to disclose to M.J. Select or its shareholders their awareness in 1999 that GAD was invested in Reg D and otherwise illiquid sub-funds contrary to the reported trading strategy for M.J. Select; and

    c.    Made material misrepresentations of fact in M.J. Select's 1999-2000 Report and 1998-1999 Report that M.J. Select was using a market-neutral trading approach using arbitrage strategies, when in fact they knew that M.J. Select's trading advisor, GAD, did not utilize trading strategies and practices consistent with the statements made in this annual report.

351. In addition, in connection with the inducement of ZCM MFC's acceptance of the assignment of Asset Allocation's interests in MJD and MJFA, Defendants Michael Coglianese, MC C.P.A., and CCS Inc. executed written contracts with ZCM MFC on or about May 31, 2000, in which they: (1) promised to recognize ZCM MFC as the sole owner of 100% of the shares that Martin James had invested with them in MJD and MJFA under the name of Asset Allocation; and (2) confirmed that ZCM MFC, as sole owner, would have "all of the rights and privileges that normally accompany such ownership."

352. Defendants Michael Coglianese, MC C.P.A., and CCS Inc. breached these contracts with ZCM MFC by failing to undertake any efforts or provide any oversight services whatsoever to ensure that ZCM MFC's ownership interests would be recognized and protected.

353. Similarly, in connection with the inducement of ZCM MFC's acceptance of the assignment of Asset Allocation's interests in M.J. Select, Defendants Oceanic executed a written contract with ZCM MFC on or about May 31, 2000, in which it: (1) promised to recognize ZCM MFC as the sole owner of 100% of the shares that Martin James had invested with them in MJD

98

and MJFA under the name of Asset Allocation; and (2) confirmed that ZCM MFC, as sole owner, would have "all of the rights and privileges that normally accompany such ownership."

354.    All of ZCM MFC's right and title to its interests in M.J. Select and its rights under this contract with Oceanic were transferred and assigned by ZCM MFC to ZCM Bermuda. Oceanic expressly recognized these assignments to ZCM Bermuda.

355.    Defendant Oceanic breached this contract with ZCM Bermuda by refusing to honor its valid redemption requests and diverting and converting ZCM Bermuda's interests in M.J. Select at the request of Martin James.

356.    As a natural and foreseeable consequence of the breaches of these various contracts by Defendants Michael Coglianese, MC C.P.A., CCS Inc., CCS Int'l, Oceanic, Vorisek and Vorisek & Co., Plaintiffs ZCM MFC and ZCM Bermuda suffered substantial damages in an amount to be determined at trial.

## COUNT XVII
### Violation of the Bahamian Mutual Funds Act, 1995 and Regulations Thereunder
### (Against Oceanic, Rahming and Clowes)

357.    Plaintiff ZCM Bermuda realleges and thereby incorporates by reference the allegations in paragraphs 1 to 356 above, and the allegations of Count XVIII below, as if fully set forth herein.

358.    At all material times, M.J. Select was a Mutual Fund licensed and registered under the Mutual Funds Act, 1995, of the Commonwealth of the Bahamas (the "Act").

359.    At all material times, Oceanic was a licensed mutual fund administrator.

360.    Oceanic's license required it to carry on its business as a mutual fund administrator subject to the terms and conditions specified in the Act and the Mutual Funds Regulations 1995 promulgated thereunder (the "Regulations").

99

361.   At all material times, pursuant to Regulations 4(5)(a) and 17(1) and section 3(9) and 4(5) of the Act, Oceanic owed to Plaintiffs a duty to ensure that the Directors were complying with their obligation to ensure that each edition of the Offering Memorandum made full disclosure of all material facts and risks inherent in an investment in M.J. Select.

362.   At all material times, pursuant to Regulation 4(5)(b), Oceanic owed to Plaintiffs and to M.J. Select a duty to ensure that M.J. Select was not carrying on its business in a manner which was or was likely to be prejudicial to shareholders.

363.   At all material times, pursuant to Regulation 13(a), Oceanic owed to Plaintiffs a duty to manage M.J. Select in accordance with the Regulations in the exclusive interests of the shareholders, with the diligence of a salaried agent, including in particular duties to: (1) ensure that offer and redemption prices were calculated on the basis of M.J. Select's net asset value divided by the number of shares outstanding (Regulations 6(1)(b)(i), 6(3)(b) and 19(2)); (2) manage M.J. Select in accordance with the requirement in the Regulations that advertisements made by or on behalf of the Fund were accurate and contained sufficient relevant information to ensure that they did not mislead by omission (Regulation 26(1)); and (3) manage the Fund in accordance with the Regulations set out in paragraph 313 and 314 above.

364.   Wrongfully and in breach of its duty to Plaintiffs, Oceanic: (1) allowed the Offering Memoranda to contain statements that were materially false and to omit material facts and risks inherent in an investment in M.J. Select; (2) allowed M.J. Select to carry on its business in a manner which was or was likely to be prejudicial to the shareholders; and (3) did not manage M.J. Select in accordance with the Regulations in the exclusive interests of the shareholders with the diligence of a salaried agent, and in particular (i) offer and redemption prices were not calculated on the basis of the Fund's net asset value divided by the number of shares outstanding, (ii)

100

advertisements made by or on behalf of the Fund were not accurate, and (iii) M.J. Select did not comply with the requirements in the Regulations, all as pleaded above.

365.    At all material times, pursuant to Regulation 17(1) and sections 4(5) & 4(6) of the Act, Rahming and Clowes, as directors of M.J. Select, each owed to Plaintiffs a duty to ensure that the Offering Memoranda were accurate and made full disclosure of all material facts and risks inherent in an investment in M.J. Select.

366.    Wrongfully and in breach of their duty to Plaintiffs, Rahming and Clowes each allowed the Offering Memoranda to contain statements that were materially false and to omit material facts and risks inherent in an investment in M.J. Select as pleaded above.

367.    Indeed, in direct violation of Oceanic's, Rahming's and Clowes statutory and duties as Administrator and Directors of M.J. Select, Oceanic and Clowes have affirmed in this Court that: (1) they never received or reviewed a copy of the April 2000 Offering Memorandum until August 2001 when ZCM instituted the original ZCM Action, (2) they were "unaware that the offering document was in existence or distributed to anyone," and (3) were "unaware of the contents and statements contained in that document, until around August 2001."

368.    As a result of Oceanic's, Rahming's, and Clowes' violations of the Act and the Regulations promulgated thereunder, Plaintiffs have been damaged in an amount to be determined at trial, but not less than $14,235,206.78 exclusive of costs, fees and interest.

**COUNT XVIII**
**Breach of Common Law Duty of Care Under Bahamian Law**
**(Against Oceanic, Rahming, and Clowes)**

369.    Plaintiffs reallege and thereby incorporate by reference each and every allegation above as if fully set forth herein.

101

370.    At all material times, Oceanic, Rahming and Clowes owed to Plaintiffs a duty

under the common law of the Commonwealth of the Bahamas to take reasonable care when

making representations in or by, or allowing representations to be made in or by, the Offering

Memoranda, and the monthly and annual performance reports, account and financial statements.

371.    Wrongfully and in breach of its/her/his duty to Plaintiffs, and acting negligently,

each of Oceanic, Rahming and Clowes took no care or no reasonable care when making

representations in or by, or allowing representations to be made in or by, the Offering Memoranda,

and the monthly and annual performance reports, account and financial statements, as pleaded

above.

372.    Indeed, in direct violation of Oceanic's, Rahming's and Clowes common law

duties as Administrator and Directors of M.J. Select, Oceanic and Clowes have affirmed in this

Court that: (1) they never received or reviewed a copy of the April 2000 Offering Memorandum

until August 2001 when ZCM instituted the original ZCM Action, (2) they were "unaware that the

offering document was in existence or distributed to anyone," and (3) were "unaware of the

contents and statements contained in that document, until around August 2001."

373.    As a result of Oceanic's, Rahming's, and Clowes' conduct, Plaintiffs have been

damaged in an amount to be determined at trial, but not less than $14,235,206.78 exclusive of

costs, fees and interest.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a)     Declare that Defendants' conduct (i) violates § 10(b) of the Securities and
       Exchange Act of 1934 and Rule 10b-5 and/or violates § 20(a) of the Securities and
       Exchange Act of 1934; (ii) violates § 206 of the Investment Advisors Act of 1940;
       (iii) violates the Illinois Securities Law of 1953; (iv) constitutes conspiracy to
       defraud, fraud and conversion; (v) unjustly enriched the defendants; (vi) breaches

their contractual obligations and implied duties of good faith and fair dealing; (vii) constitutes intentional interference with contract; (viii) constitutes accounting malpractice; (ix) breaches their fiduciary duties to Plaintiffs under Illinois and Bahamian common law; and (x) violates §§ 3(9), 4(5) & 4(6) of the Mutual Funds Act, 1995 of the Commonwealth of the Bahamas and Regulations 4(5)(a), 4(5)(b), 6(1)(b)(i), 6(3)(b), 13(a), 17(1), 19(2), and 26(1) promulgated thereunder;

b)  Order that Defendants promptly rescind all of Plaintiffs' subscription agreements with M.J. Select and remit to Plaintiffs the full value of the amounts they invested in accordance with Illinois Securities Law;

c)  Declare that the investment advisory contracts between M.J. Select and each of Delta, GAD, Millennium, and Sonic are rescinded and order Delta, GAD, Millennium, and Sonic to repay all fees earned in connection therewith;

d)  Permanently enjoin Defendants, their officers, directors, agents, servants, employees, representatives, attorneys, subsidiaries, related companies, successors, assigns, and all others in active concert or participation with them or any of them from directly or indirectly transferring, selling, assigning, interfering with, or disposing of any property, funds, accounts or monies in which Plaintiffs Zurich Capital Markets Inc., ZCM Matched Funding Corp., ZCM Asset Holding Company LLC and ZCM Asset Holding Company (Bermuda) Limited have an interest, including any funds obtained from the redemption of interests in M.J. Diversified, L.P., M.J. Financial Arbitrage, L.P., or M.J. Select Global;

e)  Order that Defendants account to Plaintiffs for Defendants' profits and pay any damages sustained by Plaintiffs arising from the foregoing wrongful and unlawful acts of Defendants and that, in accordance with such accounting, Plaintiffs be awarded judgment for such profits or damages;

f)  Order that Defendants pay Plaintiffs for any and all damages sustained by Plaintiffs arising from the foregoing wrongful and unlawful acts of Defendants;

g)  Order that Defendants Michael Coglianese, the Coglianese Accounting Entities, Oceanic, Rahming, Clowes, and the New World Defendants promptly deliver to Plaintiff ZCM Bermuda a complete accounting of all transactions involving M.J. Select since May 31, 2000 and identify and assign to Plaintiff ZCM Bermuda any proceeds or assets in their control derived from the redemption of ZCM Bermuda's interests in M.J. Select.

h)  Order that Defendants Michael Coglianese, the Coglianese Accounting Entities, GLC Services, Oceanic, Rahming, Clowes, and the New World Defendants promptly take any and all steps within their power to redeem and return to Plaintiff ZCM Bermuda its shares in M.J. Select;

103

i)   Order that all Defendants promptly return to M.J. Select any and all funds that were transferred out of M.J. Select to them as set forth herein;

j)   Permanently enjoin all Defendants, their officers, directors, agents, servants, employees, representatives, attorneys, subsidiaries, related companies, successors, assigns, and all others in active concert or participation with them or any of them from interfering with the redemption of Plaintiff ZCM Bermuda's shares in M.J. Select;

k)   Order that all Defendants be required to return all fees retained, from at least June 1, 2000 to the present, received by them while they were in material breach of their contracts and fiduciary duties set forth above;

l)   Order that all Defendants be required to pay over to Plaintiffs all fees retained and profits earned by them, from at least June 1, 2000 which amounts would constitute an unjust enrichment to Defendants and Plaintiffs' expense as set forth above;

m)   Order that Plaintiffs be awarded their costs and reasonable attorneys' fees incurred in connection with the institution and prosecution of this civil action;

n)   Award Plaintiffs punitive damages as to Counts VIII (Fraud), IX (Conspiracy to Defraud), XI (Conversion), and XIII (Intentional Interference With Contract) in an amount to be determined at trial; and

o)   Order such other and further relief as justice may require.

Dated:  November 26, 2003

Respectfully submitted,

ZCM ASSET HOLDING COMPANY
(BERMUDA) LIMITED, ZURICH
CAPITAL MARKETS INC., ZCM
MATCHED FUNDING CORP., ZCM
ASSET HOLDING COMPANY LLC,


By: _Alan B. Vickery / cob_
   Alan B. Vickery
   Philippe Z. Selendy
   Courtney R. Rockett
   Frank C. Moore
   BOIES, SCHILLER & FLEXNER LLP
   570 Lexington Avenue
   New York, New York 10022
   (212) 446-2300

104

David P. Sanders
Chadwick O. Brooker
JENNER & BLOCK LLC
One IBM Plaza
Chicago, Illinois 60611
(312) 222-9350

*Counsel for Plaintiffs*

# SEE CASE FILE FOR EXHIBITS